**Frederick Douglass LEWIS, Petitioner,**

v.

**DISTRICT OF COLUMBIA COMMISSION ON LICENSURE TO PRACTICE the HEALING ART, Respondent.**

**No. 11821.**

District of Columbia Court of Appeals.

Argued Nov. 9, 1977.

Decided April 27, 1978.

contention; thus, we do not reach the second. We reverse.

I

Dr. Lewis opened an office for the private practice of medicine in the District of Columbia in June 1974, with a practice primarily devoted to the use of acupuncture as a treatment mode. He operated this office on a full-time basis for approximately six months. In December 1974, Dr. Lewis accepted full-time employment with the District of Columbia government and, for approximately the next twelve months, his private office was open only during evening hours and on Saturdays. During these hours Dr. Lewis was always in attendance. Stephen Kim, a trained Korean acupuncturist (not a licensed physician) who worked under Dr. Lewis' supervision and control also working during those hours. In November 1975, after consulting with his then attorney (who also served as counsel to the Medical Society of the District of Columbia), Dr. Lewis opened his office two days a week for several hours during the day. These office hours were maintained only for approximately two months. During this period Virginia Luaces, a Cuban-trained surgical nurse, was permitted by Dr. Lewis to stimulate a small surgical staple (previously implanted in the patient's ear) by applying a risk-free electrical impulse as part of a weight reduction program. The surgical staples themselves were implanted by either Dr. Lewis or Mr. Kim.

On June 4, 1976, the Commission informed Dr. Lewis by mail of contemplated adverse action against his license for misconduct based on charges that he had permitted his agents or employees to perform acupuncture upon Virgil Clark and Barbara A. Hampton on five occasions between August 1975 and January 1976, "without the direct and immediate supervision and control of a licensed physician, all in violation of Section 2–102, D.C.Code, 1973 ed., and

Justin D. Simon, Washington, D. C. with whom Seymour Glanzer, Washington, D. C., was on the brief, for petitioner.

Margaret L. Hines, Asst. Corp. Counsel, Washington, D. C. with whom Louis P. Robbins, Principal Deputy Corp. Counsel, and Richard W. Barton, Deputy Corp. Counsel, were on the brief, for respondent. John R. Risher, Jr., Corp. Counsel, Washington, D. C., entered an appearance for respondent.

Before NEWMAN, Chief Judge, and KELLY and MACK, Associate Judges.

NEWMAN, Chief Judge:

Petitioner, Dr. Lewis, at all times relevant hereto, was a licensed physician authorized to practice medicine in the District of Columbia and recognized as an expert in acupuncture.[1] He petitions for review seeking reversal of an order of the Commission on Licensure to Practice the Healing Art in the District of Columbia (Commission) suspending his license to practice medicine for three years. Petitioner raises two major issues: first, that the Commission's order of suspension denied him due process of law; and second, that the Commission's findings of fact and conclusions of law are not supported by and in accordance with reliable, probative, and substantial evidence. We agree with petitioner's first

1. *See* Roberts, *Acupuncture: The Meeting of East and West: An Interview with Frederick D.* Lewis, M.D., 40 Journal of Rehabilitation 21–25 (No. 3 May-June, 1974).

the Commission's adopted rules of December 7, 1972, and March 1, 1974." (These code sections are hereafter referred to as the Healing Arts Act). On August 8, 1976, the Commission added four new charges involving Clark and Hampton based on acupuncture treatments administered during the same period and alleging a similar lack of proper supervision. On October 29 and November 12, 1976, the Commission conducted hearings on these charges. On February 8, 1977, the Commission issued its decision. After making Findings of Fact and Conclusions of Law, the Commission suspended petitioner's license for three years. This appeal followed.

The record reflects that from June 1974 until November 1975, petitioner and another trained acupuncturist were in attendance at the office whenever it was open. There was also testimony that administrative and clerical employees worked at the office during the daytime hours several days a week. Dr. Lewis testified that these employees were not authorized to perform acupuncture. Dr. Lewis testified that except for the electrical stimulation of surgical staples [2] he adhered to a strict policy that no acupuncture treatment was to be performed by anyone during times when he was not present at his office. In support of this contention, the record reveals that on those occasions when petitioner discovered an employee had deviated from that policy, the employee was summarily discharged.

Virgil Clark and Barbara Hampton provided most of the evidence against petitioner. They testified to receiving acupuncture treatment from various employees of Dr. Lewis on nine separate occasions. During evening hours, while Dr. Lewis was present at the clinic and available to supervise and consult with acupuncturists and patients, Clark was treated by acupuncturist Stephen Kim on three occasions; and Hampton was treated by Kim on one occasion. During daytime hours when only performance of electrical stimulation was authorized by Dr. Lewis in his absence, Clark testified that he received treatment with acupuncture needles and pills from Virginia Luaces on two occasions.[3] Hampton testified that she was treated for the first time in the evening of August 13, 1975, and again on August 20, by Nurse Joanna Lee, who implanted a surgical staple in Hampton's ear and placed needles in her ear and hands. Hampton was also treated by Nurse Luaces on one later occasion. Hampton testified that she had not seen Lewis on any of these visits. In response, Dr. Lewis testified that from August 8 to August 23, 1975, he was out of the country, and that he had arranged for a licensed physician to cover his practice. He had left strict instructions that no new patients were to be treated during his absence.[4]

Based on the evidence before it, the Commission made its findings of fact. The bulk of these findings summarizes the testimony of Clark and Hampton. The Commission thus appears to have credited the testimony of these witnesses and discredited that of the petitioner. In essence, the dereliction found by the Commission was the failure of petitioner to meaningfully supervise his employees in the administering of acupuncture therapy. This lack of supervision, according to the Commission, took two forms: (1) failure of petitioner to properly supervise employees in the administration of acupuncture treatment while he was present on the premises, and (2) permitting employees to practice acupuncture, including electrical stimulation of a surgical staple,[5] while no physician was present.

2. See note 5, infra.

3. Ms. Luaces was fired when Dr. Lewis learned that she had performed this acupuncture treatment on Clark.

4. Upon his return, and upon hearing that Ms. Lee had disregarded these instructions, Dr. Lewis discharged her immediately.

5. The Commission thus rejected the testimony of petitioner, the only expert in the field of acupuncture or medicine who testified, that such electrical stimulation of previously implanted surgical staples did not constitute the practice of acupuncture.

## II

In this court, petitioner claims a denial of due process. The key contention in petitioner's due process claim is that there was insufficient prior notice of what conduct was proscribed to permit the application of sanctions against him for "misconduct" under D.C.Code 1973, § 2–123. Because this notice issue is so central to the petitioner's due process claim, we deem it appropriate to briefly recount the history of acupuncture regulation in this jurisdiction.

The advent of acupuncture clinics in the District of Columbia in the early 1970's triggered prompt reactions. In 1972, a physician (not petitioner) specializing in acupuncture treatment who intended to open a clinic in the District of Columbia sought advice as to any proscriptions on the manner in which such acupuncture treatment could be administered. The Commission, at its meeting of December 7, 1972, concluded

> that acupuncture is a subcutaneous procedure of the healing art which may be practiced only by a licensed physician of the District of Columbia or under the direct and immediate supervision of a licensed physician of the District of Columbia who will be fully responsible for the actions of the acupuncturist. [Minutes of the Commission, Record at 317.]

This policy statement was never published in the D.C. Register or in any other governmental publication.

Subsequent to the adoption of this policy statement, the Commission became concerned that its restrictive provisions on supervision were being interpreted too loosely by those administering acupuncture treatments. In response to this concern, the Commission at its meeting of March 1, 1974, adopted a "Proposed Policy . . . Concerning Acupuncture." This statement differed from that of December 7, 1972, by not

only requiring that all treatments be administered under the direct and immediate supervision of a licensed physician (as set forth in the 1972 statement) but also by requiring that the physician be physically present throughout the treatment. Although this proposed policy statement was published in the D.C. Register on March 18, 1974, as a *proposed policy,* nothing was done by the Commission thereafter formally to adopt or promulgate it.

During 1973 and 1974, a number of acupuncture clinics commenced operation in the District of Columbia. As a result of public interest and concern, a committee of the City Council, chaired by Dr. Henry S. Robinson, Jr., held hearings in May 1974, to determine whether the practice of acupuncture should be legislatively regulated. Based on these hearings, the Committee proposed and the City Council adopted Regulation No. 74–38, restricting the practice of acupuncture solely to licensed physicians and dentists. In subsequent litigation in the Superior Court, this Regulation was declared unconstitutional in a well-reasoned opinion by Superior Court Judge Fred B. Ugast. *See Wensel v. Washington,* C.A. Nos.11004–74 & 11005–74 (Super.Ct. Apr. 10, 1975).[6]

With no viable regulations or rules establishing treatment standards, the Commission found that petitioner's conduct violated the policy which it had adopted at its meeting of March 1, 1974, and published in the D.C. Register, as well as similar policies "announced" by it on December 7, 1972,[7] and by the Medical Society of the District of Columbia on March 26, 1973, and October 29, 1973. It further found that Dr. Lewis was aware of the published policies of the Medical Society of the District of Columbia.[8]

The Commission, not challenging the holding in *Wensel, supra,* concedes that acu-

---

6. A copy of this opinion is attached hereto as an Appendix.

7. The record is silent as to the method by which this policy was "announced."

8. The Commission made no finding on the issue of petitioner's knowledge of the *Commission's* published or "announced" policies.

puncture treatment may be administered by one not a licensed physician, provided such treatment is properly supervised by a licensed physician. Thus, the basic due process issue presented here is whether the medical profession was properly placed on notice of the degree of supervision required to be exercised by a licensed physician over acupuncture technicians. It is to this point that we now turn.

## III

■ Central to constitutional notions of due process is the principle that a person will be given prior notice of that conduct which is proscribed and which could form the basis for governmental action against him. *Lanzetta v. New Jersey,* 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888 (1939); *Ladrey v. Commission on Licensure to Practice the Healing Arts in the District of Columbia,* 104 U.S.App.D.C. 239, 261 F.2d 68, *cert. denied,* 358 U.S. 920, 79 S.Ct. 288, 3 L.Ed.2d 239 (1958); *Czarra v. Board of Medical Supervisors,* 25 App.D.C. 443 (1905). Nowhere in the Healing Arts Act is the term "misconduct" defined. A similar omission resulted in the standard of "unprofessional conduct" in the prior Healing Arts Act being held unconstitutional as applied by the Board of Medical Supervisors (the predecessor to the Commission) to revoke the medical license of a physician for distribution of "obscene literature" where said literature concerned diagnoses and treatment of venereal diseases. *Czarra, supra.* However, where applied to conduct constituting a criminal abortion, "misconduct" was held to be not so vague a standard as to deny due

process. "[M]isconduct certainly included, and must have been known by a medical practitioner to have included, the performance of an illegal abortion." *Ladrey, supra* 104 U.S.App.D.C. at 242, 261 F.2d at 71 (footnote omitted).[9]

While recognizing in its decision "the lack of clear articulated standards for the practice of acupuncture by nonlicensed practitioners in the District," the Commission asserts in this court that the medical profession had been adequately placed on notice of the proper standards for the supervision of acupuncture technicians by its 1972 policy statement,[10] by its 1974 "Proposed Policy" and by similar pronouncements by the Medical Society of the District of Columbia. The Commission concedes that if the 1974 "Proposed Policy" constitutes a rule within the meaning of the District of Columbia Administrative Procedure Act, D.C.Code 1973, §§ 1–1501 *et seq.,* and our decision in *Junghans v. Department of Human Resources,* D.C.App., 289 A.2d 17 (1972), it was never properly adopted. The Commission contends that although it was not adopted as a rule, the policy was adequate to place the medical profession on notice of the required standard of supervision. Thus, says the Commission, the vagueness in the term "misconduct" found to be fatally defective in *Czarra, supra,* is cured by the promulgation of something less formal than a rule—*i. e.,* a "Proposed Policy."[11]

The fatal defect in this analysis is demonstrated by the record in this case which reflects suspension of a medical license without a showing that the physician was given notice from any governmental agency

---

9. It appears that consideration was given to the utilization of the criminal process to regulate acupuncture treatment. However, this record discloses that in March 1974, after consultation with petitioner and his attorney, the United States Attorney for the District of Columbia determined there was no criminal violation of the D.C. Healing Arts Act in the manner in which petitioner represented that he conducted his practice and so informed petitioner in writing at petitioner's request.

10. We need deal here only with the 1974 policy since it superseded that of 1972. *See Wensel, supra.*

11. The Commission in its argument in this court thus seeks to avoid the provisions of the 1967 Reorganization Plan, D.C.Code 1973, Appendix to Title 1, which vested authority to make rules for the execution and enforcement of the Healing Arts Act in the City Council, rather than in the Commission. *See Wensel, supra.*

or other legal source of the required standard of supervision. There was no finding that petitioner had actual knowledge of these "policies." While notice of properly promulgated rules is judicially presumed from their proper promulgation, the same does not hold true for policy pronouncements such as those at issue here. *See Junghans, supra.*

Nor can we accept the Commission's thesis enunciated in its Conclusion of Law that petitioner somehow had adequate notice that his activities were proscribed from the general standards of conduct of his profession and from the policy statements issued by the Medical Society of the District of Columbia. The latter, a private, voluntary association of physicians, was vested with no governmental authority or function. Its statements on the conduct of acupuncture had never been adopted by the Commission, formally or informally, as having binding legal effect.[12] Adoption of such a policy would, in fact, have limited the practice of acupuncture to qualified medical investigators in medical research facilities. As the court found in *Wensel*:

> The position taken by the D.C. Medical Society, as announced in its March 26, 1973 policy statement, is to the effect that the administration of acupuncture is an experimental procedure and, as such, research should be conducted only in an institution having a committee on human research, such as a medical school or its affiliated hospital, by qualified investigators under the usual limitations imposed on human experimentation. (A "qualified investigator" is defined as one who is licensed to practice medicine and surgery

in the District of Columbia and by virtue of his training, knowledge, and experience is adequately and properly informed in the particular field or subject of his experimental investigation.) [*Wensel, infra* at 1163.]

All of petitioner's conduct which the Commission found to constitute "misconduct" occurred from four to nine months after the decision in *Wensel.* As the Commission found, petitioner was fully aware of this decision. Since *Wensel* invalidated on constitutional grounds the legislative attempt to prohibit the use of technicians in administering acupuncture treatments by limiting such treatments exclusively to licensed physicians and dentists, one could have concluded, quite reasonably, that attempts by the Medical Society of the District of Columbia to restrict even more severely such treatment would suffer a similar constitutional infirmity, if enforced by governmental action.

 The test for determining unconstitutional vagueness is whether the statutory language conveys sufficiently definite warning of what conduct is proscribed when measured by common understanding and practices. *Jordan v. DeGeorge,* 341 U.S. 223, 231–32, 71 S.Ct. 703, 95 L.Ed. 886 (1951). Without the guidance of clearly articulated and properly promulgated standards, petitioner could not know, in spite of his efforts to ascertain (*see* note 9, *supra*), whether or not the procedures which he permitted constituted misconduct. Suspension of his license thus deprived Petitioner of due process.

*Reversed.*

---

12. We recently decided in a somewhat analogous situation that an attorney is on notice as to and bound by existing professional standards, which are codified by a private organization, the American Bar Association, *because* that organization's Code of Professional Responsibility has been properly adopted and promulgated by the District of Columbia Court of Appeals as the standard of professional conduct governing the practice of law in the District of Columbia. *See In re Keiler,* D.C.App., 380 A.2d 119, 120 n. 1 (1977). As is clear from our opinion in *Keiler,* it was the fact of adoption and promulgation by the appropriate court which made the Code binding authority on the legal profession rather than the fact of its promulgation by the American Bar Association.

APPENDIX

SUPERIOR COURT OF THE DISTRICT
OF COLUMBIA CIVIL DIVISION

Civil Action No. 11004–74

Louise O. Wensel, M. D.; Tin-Yam Fung;
Shen-Chang Hsu; and Yick-Chong
Chan, plaintiffs

v.

Walter E. Washington, Mayor, City of
Washington, defendant

Civil Action No. 11005–74

Clare E. Urie; Ralph M. Coan, M. D.;
Grace Kwok Yin Wong and Friends of
Acupuncture, a Non-Profit Corpora-
tion, plaintiffs

v.

Walter E. Washington, Mayor, District of
Columbia; John A. Nevius; Sterling
Tucker; W. Antoinette Ford; Rock-
wood Foster; Tedson J. Myers; Jerry
A. Moore, Jr.; Marjorie Parker; Henry
Robinson and Marguerite Selden, Indi-
vidually, and as Members of the Dis-
trict of Columbia City Council, defend-
ants

OPINION

This is an action seeking declaratory and
injunctive relief. Plaintiffs in Civil Action
No. 11004–74 are: Louise O. Wensel, M. D.,
a licensed physician in the District of Co-
lumbia and the founder and Director of the
Washington Acupuncture Center; Tin-Yam
Fung; Shen-Chang Hsu; and Yick-Chong
Chan, all natives and citizens of China, who
are alleged to have been trained in the
practice of acupuncture in the Orient, and
who are presently residing in the Metropoli-
tan Washington, D. C., area. These plain-
tiffs are employed as practicing acupunctu-
rists by the above-named plaintiff, Dr.
Louise O. Wensel. Plaintiffs in Civil Action
No. 11005–74 are: Ralph M. Coan, M. D., a
licensed physician in the District of Colum-
bia and the Medical Director of the Acu-
puncture Center of Washington, D. C.;
Clare E. Urie, an adult resident of the Dis-
trict of Columbia and a patient of Dr. Ralph

M. Coan, who has been receiving acupunc-
ture treatments at the Acupuncture Center
of Washington, D. C.; Grace Kwok Yin
Wong, employed as a practicing acupunctu-
rist by the Acupuncture Center of Wash-
ington, D. C.; and Friends of Acupuncture,
a nonprofit District of Columbia corpora-
tion, composed of individual patients organ-
ized for the purpose of protecting and pro-
moting the concept of acupuncture.

Named as the sole defendant in Civil
Action No. 11004–74 is Walter E. Wash-
ington as Mayor of the City of Washington.
In Civil Action No. 11005–74, there are also
joined with him as defendants the nine
members of the District of Columbia City
Council sitting in 1974 in their individual
capacity and as members of the Council.

On December 14, 1974, plaintiffs in Civil
Action No. 11004–74 filed a complaint for a
permanent injunction and for a declaratory
judgment asking the Court to declare Regu-
lation No. 74–38 null and void and to enjoin
its enforcement. Plaintiffs in Civil Action
No. 11005–74, both in their individual ca-
pacities and as a class, on the same date
filed a complaint seeking similar declarato-
ry and injunctive relief with respect to that
regulation. Adopted by the District of Co-
lumbia City Council on December 3, 1974,
and approved by the Mayor-Commissioner
of the District of Columbia on December 13,
1974, Regulation No. 74–38 deals with the
practice of acupuncture in the District of
Columbia.

Contemporaneously, on December 14th,
plaintiffs in both cases filed motions for a
temporary restraining order and a prelimi-
nary injunction to enjoin the enforcement
of Regulation No. 74–38. Judge Hamilton,
after a hearing held on December 14th,
issued a temporary restraining order with
respect to Section 1 of that regulation and
also ordered both actions consolidated for
purposes of the hearing set for January 3,
1975, and subsequently continued until Jan-
uary 6th, on the plaintiffs' motion for pre-
liminary injunction. Also at this time de-
fendants filed a motion for summary judg-
ment.

On January 6th, upon consent of all parties, this Court granted the motion of the Medical Society of the District of Columbia for leave to enter the cause of action as *amicus curiae*, and the parties were to submit within one week suggested issues to be addressed by the *amicus* in its brief or in testimony presented in open court. The Medical Society was given until January 24, 1975, to file with the Court its initial *amicus curiae* brief. The January 6th consent order further provided that, if possible, the case should be assigned to a single Judge for all purposes and that the hearing on plaintiffs' motion for preliminary injunction be consolidated with the hearing on the merits scheduled for February 3, 1975. The Court also ordered the temporary restraining order extended to February 3, 1975, and directed a letter to the President of the Dental Society of the District of Columbia, advising that the Society could, if it so desired, enter the case in a similar *amicus curiae* capacity to the Medical Society. No response was ever received.

Plaintiffs in both actions subsequently submitted a statement of issues or questions to the *amicus curiae* and the responses were embodied in the *amicus* brief filed on January 24th. On January 20, 1975, Chief Judge Greene specially assigned these cases to this Court for all purposes.

On January 29, 1975, a pretrial hearing was held, at which time the Court denied defendants' motion for summary judgment and their oral motion to dismiss without prejudice and directed the defendants to file an answer. The D. C. Medical Society as *amicus curiae* was directed to file a memorandum in response to specific questions raised by the Court. A further hearing was set for February 3, 1975, on the question of whether Civil Action No. 11005–74 could be maintained as a class action, but plaintiffs subsequently withdrew their request for certification as a class action. The case was set for trial on February 7, 1975, and the temporary restraining order extended until that time.

On February 7, 1975, the hearing on the merits began. At that time the temporary restraining order was extended pending further order of the Court, and all allegations in the complaint relating to a class action were ordered stricken. A partial response of the D. C. Medical Society as *amicus curiae* to questions propounded by the Court was filed in open court. (The remaining response was filed on February 14th.) The record of hearings and debate before the District of Columbia City Council and the Committee on Health, Welfare and Aging, as well as all written statements submitted at those hearings, was ordered to be made a part of the record. Plaintiffs in the two actions offered a total of nine witnesses and twenty-one exhibits; the District of Columbia offered no witnesses and the D. C. Medical Society as *amicus curiae* offered one witness. The hearing on the merits was completed February 11th, all parties were directed to submit written memoranda by February 20th, and oral argument was scheduled to be heard on February 21st.

When the Court inquired of counsel at the outset of the argument on February 21st as to whether a missing transcript of the hearings held on the evening of May 28, 1975, before the Committee on Health, Welfare and Aging, had been filed as ordered, the Corporation Counsel advised the Court that he had not yet been supplied with any transcript by the City Council and was uncertain whether that session had been recorded. The Court thereupon deferred oral argument until March 7th to permit the District of Columbia to ascertain the whereabouts of any recording and to submit a transcript to all parties by March 4th, or be prepared to offer a full explanation to the Court as to why the District could not comply with the Court's previous order in this regard. A transcript was subsequently prepared and filed.

On March 7th, oral argument was heard, after which the Court took the matter under advisement, considering the case as fully tried and a decision on the merits appropriate.

## ISSUES

This case presents basically two legal issues. The first, which is more limited in nature, involves the authority of the D. C. City Council to adopt a regulation governing the practice of acupuncture. The second, which is of broader significance, concerns the constitutionality of Regulation No. 74–38, which limits the administration of acupuncture to licensed physicians and dentists only.

## I

### AUTHORITY OF D. C. CITY COUNCIL TO ADOPT REGULATION NO. 74–38

On December 3, 1974, the District of Columbia City Council approved, after a second reading, Regulation No. 74–38, dealing with the practice of acupuncture. Mayor Walter E. Washington signed the regulation on December 13, 1974, and it became effective on that date.[1]

The legislative authority of the District of Columbia City Council prior to January 3, 1975, was limited, and it is agreed that the Council did not at that time have the authority to set up licensing requirements for acupuncturists absent a congressional enabling act. In determining whether the City Council possessed the statutory authority to enact a regulation dealing with the practice of acupuncture, it is necessary to determine the nature and extent of any congressional grant of authority and to trace its development through the years.

In 1929 Congress passed the Healing Arts Practice Act, 1973 D.C.Code, §§ 2–101, et seq. As part of this Act, an independent Commission on Licensure to Practice the

Healing Art was created and given specific authority as follows (§ 2–103):

There is hereby created a Commission on Licensure to Practice the Healing Art in the District of Columbia * * *. The Commission shall make and from time to time may alter such rules as it deems necessary for the conduct of its business, and for the execution and enforcement of the provisions of * * * [the Act].

By Sections 1 and 2 of the Reorganization Plan No. 5 of 1952, Title 1, Administration, Appendix, 1973 D.C.Code, the Commission on Licensure to Practice the Healing Art in the District of Columbia was abolished as an independent commission and all of its functions were transferred to the Board of Commissioners of the District of Columbia. As the Corporation Counsel testified the Commission on Licensure was abolished on paper, and in essence reconstituted with its name remaining unchanged, but its status an an independent body no longer existed. It continued to function, however, as it had in the past, but was limited in its delegated authority. From 1952 to 1967, the rule-making functions delegated under § 2–103 of the Act were exercised by several District of Columbia executive departments.

In 1967 regulatory and other functions vested in the Board of Commissioners of the District of Columbia were transferred to the City Council by Section 402 of Reorganization Plan No. 3, Title 1, Administration, Appendix, 1973 D.C.Code. The stated authority of the District of Columbia City Council for enacting Regulation No. 74–38 is Sections 402(34) and (35) of the Reorganization Plan. These sections provide as follows:

---

1. Regulation No. 74–38:

*Section 1.* The practice of acupuncture shall be limited to physicians and dentists licensed to practice in the District of Columbia for a period not to exceed one year, during which time regulations are being developed by the Department of Human Resources for submission to the Council.

*Section 2.* The Director of the Department of Human Resources is directed to develop an examination and other criteria for licensure of practitioners of acupuncture who are neither licensed to practice medicine or

dentistry in the District of Columbia. These regulations shall be forwarded to the Council within one year after enactment of this regulation.

*Section 3.* The Director of the Department of Human Resources is further directed to recommend minimum standards for clinics specializing in acupuncture treatment. The recommendations shall be forwarded to the Council within six months of enactment of this regulation.

*Section 4.* This regulation shall become effective immediately upon enactment.

Sec. 402. *Transfer of functions to Council.* The following regulatory and other functions now vested in the Board of Commissioners of the District of Columbia are hereby transferred to the Council (subject to the provisions of section 406 of this reorganization plan):

(34) Making and altering rules for the conduct of business of agency administering, and for the execution and enforcement of, the Healing Arts Practice Act of 1928, under D.C.Code, sec. 2–103, and adopting and altering a common seal thereunder.

(35) Establishing minimum standards of preprofessional and professional education in the healing art and establishing minimum standards for hospitals for intern training under D.C. Code, sec. 2–103a(a).

It follows on the basis of these provisions that, after adoption of the 1967 Reorganization Plan, the City Council was vested with the "regulatory function" to make rules for the "execution and enforcement" of the Healing Arts Practice Act under D.C.Code § 2–103. The City Council has the same function which the Commission on Licensure to Practice the Healing Art in the District of Columbia originally had under the Act. Thus, under D.C.Code § 2–103 the City Council has the power to "make and from time to time * * * alter such rules as it deems necessary * * * for the execution and enforcement of the provisions of * * * [the Act]." The Court finds that the 1967 Reorganization Plan and D.C.Code § 2–103 together, as thus interpreted, give the City Council the authority to make "rules" in connection with the execution and enforcement of the Healing Arts Practice Act.

The City Council's power to make rules for the execution and enforcement of the provisions of the Healing Arts Practice Act should not be confused with the Mayor's delegation of authority under Commissioner's Order No. 69–96, dated March 7, 1969. As previously noted, in 1952 the Commission on Licensure to Practice the Healing Art in the District of Columbia was abol-ished and its function was transferred to the Board of Commissioners. By the 1967 Reorganization Plan, the Mayor-Commissioner was charged with all functions of the Board of Commissioners *except* those transferred to the City Council. Sections 402(34) and (35) of the 1967 Reorganization Plan transferred from the Board of Commissioners to the City Council the power to make rules for the execution and enforcement of the Healing Arts Practice Act under D.C. Code § 2–103. All other powers of the Board of Commissioners under the 1952 Reorganization Plan with regard to the Healing Arts Practice Act remained with the Mayor-Commissioner. Thus, the rule-making function of the Commission on Licensure held by the Board of Commissioners under the 1952 Reorganization Plan went to the City Council, while all other functions, including the day-to-day administrative functions of the Commission on Licensure, were transferred to the Mayor-Commissioner.

When the Mayor-Commissioner issued Commissioner's Order No. 69–96 in 1969, he was delegating the administrative, non-rule-making authority, which he held under the 1967 Reorganization Plan, in an appropriate manner. Since the Mayor-Commissioner had no rule-making functions for the Healing Arts Practice Act under the 1967 Reorganization Plan, he was not dealing with or delegating the rule-making function held by the City Council.

Under § 2–101(b) of the 1973 D.C.Code, "The healing art" is defined as follows:

* * * the art of detecting or attempting to detect the presence of any disease; of determining or attempting to determine the nature and state of any disease, if present; of preventing, relieving, correcting, or curing, or of attempting to prevent, relieve, correct, or cure any disease; of safeguarding or attempting to safeguard the life of any woman and infant through pregnancy and parturition; and of doing or attempting to do any of the acts enumerated above.

Section 2–102 of that Act further provides that "No person shall practice the

healing art in the District of Columbia who is not (a) licensed so to do, or (b) * * *."

The Court finds that the practice of acupuncture constitutes the practice of the healing art as defined by D.C.Code § 2–101(b).[2] This finding is supported by the testimony of, among others, plaintiff Dr. Louise O. Wensel, and of Dr. Henry S. Robinson, Jr., Chairman of the City Council's Committee on Health, Welfare and Aging. Furthermore, this finding is in line with the conclusion reached on December 7, 1972, by the Commission on Licensure to Practice the Healing Art, to the effect that acupuncture is a subcutaneous procedure of the healing art (see Court Exhibit 3). (See also, response of the D.C. Medical Society as *amicus curiae* to question propounded by the Court.)

In view of the Court's finding that the practice of acupuncture constitutes the practice of the healing art, and the Court's further finding that § 2–103 of the D.C. Code and § 402(34) and (35) of the 1967 Reorganization Plan together give the District of Columbia City Council the authority to make rules in connection with the execution and enforcement of the Healing Arts Practice Act, the Court concludes that the City Council possessed the rule-making authority to enact a regulation dealing with the practice of acupuncture.[3]

## II
## CONSTITUTIONALITY OF REGULATION NO. 74–38

### A. *Contentions of the Parties*

By their pleadings and testimony, the plaintiffs challenge Section 1 of Regulation No. 74–38, which restricts the practice of acupuncture to physicians and dentists licensed to practice in the District of Columbia, on the ground that the regulation results in a deprivation of fundamental rights guaranteed by the First, Fifth, Ninth and Fourteenth Amendments to the Constitution of the United States, and on the ground that the regulation violates the due process clause of the Fifth Amendment in that it lacks a rational relationship to a legitimate governmental health, safety and welfare interest.

It is the defendants' contention that Regulation No. 74–38 represents a municipal regulation reasonably designed to protect the health of the citizens of the District of Columbia; that it does not arbitrarily classify the persons who can perform a particular medical procedure which would unreasonably abridge plaintiffs' constitutional rights; and that the regulation does bear a real and substantial relationship to the objective sought to be obtained.

### B. *Legal Standards*

The basic legal standard upon which this regulation must be judged is that of due process of law applicable under the Fifth Amendment of the United States Constitution to the District of Columbia. The due process clause forbids discrimination which denies equal protection of the laws.[4] The due-process guarantee only requires that a law shall not be unreasonable, arbitrary, or capricious, and that the means selected shall have a reasonable and substantial relation to the object sought to be obtained. *Lapides v. Clark*, 85 U.S.App.D.C. 101, 176 F.2d 619, certiorari denied, 338 U.S. 860, 70

---

2. There was some suggestion raised at the trial that acupuncture might fall within the term "drugless healing" art under §§ 2–101(f) and 2–111 of the Act, but the limited testimony on this point was seemingly to the contrary and has not been pursued further by counsel.

3. The fact that the City Council did not at that time possess the power to itself enact independent legislation dealing with the practice of acupuncture would not preclude the adoption of a regulation calling for the development of criteria with a view to the enactment of subsequent legislation. The Court takes judicial notice of the fact that, from and after January 2, 1975, the newly elected City Council would have legislative authority under Home Rule, independent of the Healing Arts Practice Act.

4. The Equal Protection Clause of the Fourteenth Amendment has been incorporated into the Fifth Amendment for District of Columbia purposes. *Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954); *Frontiero v. Richardson*, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973); *Schneider v. Rush*, 377 U.S. 163, 84 S.Ct. 1187, 12 L.Ed.2d 218 (1964).

S.Ct. 101, 94 L.Ed. 527 (1949); *Nebbia v. New York*, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 904 (1934). Similarly, under traditional equal protection analysis, a legislative classification must be sustained if the classification itself is rationally related to a legitimate governmental interest. *U. S. Department of Agriculture v. Moreno*, 413 U.S. 528, 533, 93 S.Ct. 2821, 37 L.Ed. 782 (1972); *Jefferson v. Hackney*, 406 U.S. 535, 546, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972); *Richardson v. Belcher*, 404 U.S. 78, 81, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971); *Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970); *McGowan v. Maryland*, 366 U.S. 420, 426, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961). As the Supreme Court pointed out in *Dandridge, supra*, 397 U.S. at 485, 90 S.Ct. at 1161, "(I)n the area of economics and social welfare, a state does not violate the Equal Protection Clause merely because the classifications made by the law are imperfect. If the classification has some 'reasonable basis,' it does not offend the constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.' (Citation omitted.)" See also, *Temporaries, Inc. v. D. C. Unemp. Comp. Bd.*, 304 A.2d 14 (D.C.App.1973); *United States v. Bland*, 153 U.S.App.D.C. 254, 268, 472 F.2d 1329 (1972).

We are also mindful of the well-established principles that a questioned statutory classification is entitled to a strong presumption of constitutionality, *McDonald v. Bd. of Education*, 394 U.S. 802, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1969); *Schneider v. Smith*, 390 U.S. 17 (1968); *Lynch v. Overholser*, 369 U.S. 705, 82 S.Ct. 1063, 8 L.Ed.2d 211 (1962); *Metropolitan Casualty Ins. Co. v. Brownell*, 294 U.S. 580, 55 S.Ct. 538, 78 L.Ed. 1070 (1935), that this Court is under a duty, where possible, to adopt a construction of a regulation which sustains its constitutionality instead of invalidating it, *Screws v. United States*, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945); *District of Columbia v. Edgcomb*, 305 A.2d 506, 510 (D.C.App.1973), and that the party attacking such regulations carries a heavy burden of showing that the regulation is unreasonable and has no rational relationship to the objective sought to be obtained. *Von Stauffenberg v. D. C. Unemp. Comp. Bd.*, 148 U.S.App.D.C. 104, 107, 459 F.2d 1128 (1972); *Vanderhoof v. District of Columbia*, 269 A.2d 112, 115 (D.C.App.1970).

We are likewise cognizant of modern legal strictures which severely limit inquiry into policy considerations, particularly in an area dealing with the exercise of fundamental police powers as this regulation does, see e. g., *Richardson v. Belcher, supra*, and *Dandridge v. Williams, supra*. "Constitutionality does not depend upon whether the legislature might have achieved its objective in a more acceptable way," *Vanderhoof, supra*, at 115. However, when a challenge is made to a regulation on due process/equal protection grounds, the Court is required to consider the "facts and circumstances behind the law, the interests which the State claims to be protecting and the interest of those who are disadvantaged by the classification." *Williams v. Rhodes*, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968); accord, *Kramer v. Union Free School District*, 395 U.S. 621, 626, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969). In this case, serious issues are raised concerning the vital rights of doctors to engage in their practice of medicine without unreasonable governmental restrictions and the related rights of persons who desire and need to receive certain modalities of medical treatment which may be denied to them by the operation of Regulation No. 74-38. While this Court cannot say that constitutionally recognized "fundamental rights" are involved here (see e. g., *Loving v. Virginia*, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); *Boddie v. Connecticut*, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971); *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); *San Antonio School Dist. v. Rodrigues*, 411 U.S. 1, 109, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) (Marshall, J., dissenting) *Eisenstadt v. Baird*, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972)) which would require the government to show a "compelling state interest" in support of the regula-

tion, the interests involved nevertheless are of such a magnitude that this Court will carefully examine the record to determine whether the regulation, under the traditional due process standard of review, as set forth above, impermissibly stifles significant personal liberties. Cf., *Barnett v. Rodgers*, 133 U.S.App.D.C. 296, 410 F.2d 995 (1969); see also, *People v. Amber*, 76 Misc.2d 267, 349 N.Y.S.2d 604 (1973).

In order to properly test the validity of Regulation No. 74–38, it is necessary to examine at the outset the status of the practice of acupuncture in the District of Columbia and the legislative history of the challenged regulation before analyzing the various interests involved and determining whether the regulation unconstitutionally infringes upon them.

### C. *Acupuncture and Its Practice in the District of Columbia*

During the past several years, there has been an upsurge of interest in the practice of acupuncture in the United States. Former President Nixon's trip to the People's Republic of China in 1972, together with visits by American physicians, journalists, and scientists, has given the public a chance to observe the use and effectiveness of this ancient mode of Chinese healing. Although acupuncture is estimated to be at least 5000 years old, and has been known to American medicine for 100 years, American physicians have been reluctant to get involved in its study.

The term "acupuncture" is derived from the Latin words "acus" (the needle) and "punctua" (a pricking). As background, the following excerpts from the Report of New York State Commission on Acupuncture are enlightening:

> Acupuncture can be defined as the stimulation of a certain point (locus), or points (loci) on or near the surface of the body by the insertion of needles to prevent or modify the perception of pain (acupuncture analgesia) or to normalize physiological functions, including pain control, for the treatment of certain diseases or dysfunctions (acupuncture therapy).

 \* \* \* \* \* \*

How and why acupuncture works is still a mystery after 5,000 years.

> According to the ancient Chinese Taoist philosophy, man is subject to the basic principle of the universe, the vital energy of the force behind life and death known as Ch'i. This energy flows through the healthy body uninterruptedly under the control of two opposing forces, the Yin and the Yang.

> Yin represents negative: night, cold, dark, \* \* \*; whereas Yang denotes day, heat, light \* \* \*. The twelve basic organs and the meridians through which the energy flows are divided into the Yin or solid organs which "store but do not transmit," and the Yang or hollow organs which "transfer but do not retain." Perfect balance of Yin and Yang energy results in a state of health, or homeostasis, in Western medical terminology. However Yin and Yang are constantly changing, one into the other. It is predicated that the process of acupuncture stimulates or inhibits the flow of energy along meridians to the affected organ, and thus helps restore its aberrant physiological function to normal.

> In lieu of the ancient Chinese concepts, more than a dozen separate theories have been developed to explain its mechanisms and effects. None so far has explained satisfactorily all of the manifestations of acupuncture.

 \* \* \* \* \* \*

> As men of medicine and science saw for themselves in China evidence of the efficacy of acupuncture, and began to conduct research in their own institutions, a limited number of physicians, dentists and scientists became involved in its use and study. Acupuncture was first on the agenda of the New York State Board for Medicine at its meeting on May 11, 1972.

It was against this background that Dr. Arnold N. Benson of New York City, the founder of the then newly opened Acupuncture Center of Washington, D. C., requested advice of the Occupational and Professional Licensing Division of the D. C. Department

of Economic Development in November, 1972, as to the status of the practice of acupuncture in the District of Columbia. In response, he was notified that the Commission on Licensure to Practice the Healing Art concluded at its December 7, 1972, meeting that:

> * * * acupuncture is a subcutaneous procedure of the Healing Art which may be performed only by a licensed physician of the District of Columbia or under the direct and immediate supervision of a licensed physician of the District of Columbia who shall be fully responsible for the actions of the acupuncturist. The acupuncturist may not receive fees for his services from the patients, but must be a salaried employee of the supervising physician.

The commission further cautioned "that the physician assuming responsibility for the actions of an acupuncturist working under his supervision must be satisfied of his own ability to actually supervise and oversee the procedure." (See Court Exhibit 3.) Dr. Henry S. Robinson, Jr., Chairman of the City Council's Committee on Health, Welfare and Aging, in his testimony was under the impression that the Medical Society of the District of Columbia had supported the 1972 understanding agreement.

It is worthy of note that this 1972 policy statement on the practice of acupuncture by the Commission on Licensure to Practice the Healing Art was also in accord with the then recently promulgated Food and Drug Administration Regulations adopted after an invitational conference of consultants held at the Department of Health, Education and Welfare in September, 1972. It was the position of those in attendance that acupuncture should be classified as an experimental procedure. As a result of this meeting, the Commissioner of Food and Drugs determined that all acupuncture devices shipped in interstate commerce (effective February 21, 1973) should, along with other information, contain the following la-

bel: "Caution: Experimental Device limited to investigational use *by or under the direct supervision of a licensed medical or dental practitioner.* This device to be used only with informed consent under conditions designed to protect the patient as a research subject * * *." (Emphasis supplied.) (See Plaintiffs' Exhibit 7.)

In reliance upon this 1972 policy statement and apparently in response to increased public demand for this kind of treatment, a number of acupuncture clinics opened in the District of Columbia. News reports and newspaper articles further served to increase the public's interest and concern over the practice of acupuncture in the District. As a result, on May 28th and 30th, 1974, the Committee on Health, Welfare and Aging of the District of Columbia City Council, chaired by Dr. Robinson, held investigatory hearings to determine whether legislation should be recommended regarding the practice of acupuncture and the operation of acupuncture clinics in the District of Columbia. This committee accepted prepared statements, medical research data, and hospital records, and heard testimony from a number of individuals affected by, and interested in, the practice of acupuncture. Witnesses included licensed physicians with some experience in acupuncture and physicians operating acupuncture clinics in the District, practicing acupuncturists, acupuncture patients, government officials, and members of the D. C. Medical Society. Based upon the committee chairman's written report and recommendation that immediate and restrictive regulation of the practice of acupuncture was needed, the D. C. City Council, after the two required readings, and following limited debate, adopted Regulation No. 74–38 restricting in Section 1 the practice of acupuncture to licensed physicians and dentists for one year, and calling for the development of criteria for licensure of practitioners and standards for the operation of clinics in Sections 2 and 3.[5]

---

5. According to the pleadings and statements made in open court, plaintiffs' challenges to Sections 2 and 3 of Regulation No. 74–38 appear to be principally based on the ground that

the City Council lacked the requisite rule-making authority to adopt the regulation *in toto.* These contentions have been discussed in the first part of this opinion.

#### D. *Legislative History of Regulation No. 74–38*

What facts were established before the Committee on Health, Welfare and Aging and before the City Council which resulted in the passage of the regulation challenged herein?

Dr. Robinson stated at the public hearings and at trial that the hearings were convened because of numerous local newspaper articles concerning the practice of acupuncture in Washington, D. C., and because of complaints brought to his attention by the D. C. Medical Society and others of alleged abuses, suggesting the possibility of a need for regulation.

These alleged abuses fall into two categories: first, those relating to professional medical ethics—namely, advertising and solicitation, the exaggeration of the benefits of acupuncture therapy, particularly relating to the treatment of nerve deafness, the ownership of clinics by nonphysicians, and the use of acupuncture for financial gain, rather than for proper medical goals; second, alleged abuses involving medical hazards arising from acupuncture treatment and the manner of its administration.

Relating to the first category of alleged abuses, the physicians who appeared before Dr. Robinson's committee on behalf of the D. C. Medical Society presented testimony and written reports with regard to the effect of acupuncture therapy on various types of conditions and diseases, especially the treatment of hearing loss. Other physicians who testified on behalf of the acupuncture clinics offered extensive testimony and research findings with respect to these same conditions and diseases, as well as others, for which acupuncture treatment had been to some degree effective, e. g., multiple sclerosis, migraine headaches, rheumatoid arthritis, osteoarthritis, nerve deafness, low back syndrome, cervical spine syndrome and miscellaneous bone and joint problems.

The committee also received testimony primarily from doctors presented by the D.

C. Medical Society relating to alleged improper advertising and ownership of clinics by irresponsible persons. They expressed a concern that by the alleged use of referral agencies, the clinics were engaging in commercial exploitation and the unethical practice of advertising. An independent citizen witness told the committee that he believed that certain owners of acupuncture clinics had criminal records or were associated in the past with abortion clinics. Other witnesses testified about the propriety of alleged ownership of acupuncture clinics by nonphysicians.

In outline form these were the sum and substance of the alleged ethical abuses which were testified to before the committee and the City Council.

The second category of alleged abuses involves the question of whether acupuncture therapy gives rise to medical hazards. This issue breaks down into two areas: one, whether this modality of treatment inherently involves an actual health hazard; and two, whether the manner in which the treatments are being administered constitutes an undue health risk.

The various physicians who testified before the committee could point to few specific examples of any serious injury to patients resulting from acupuncture treatments given at times within the District of Columbia proper. Dr. Burton Epstein was careful to point out in his testimony the potential health hazards which could be caused by the inappropriate use of acupuncture. Yet, as former Chairman of the Ad Hoc Committee on Acupuncture for the D. C. Medical Society and for the American Society of Anesthesiologists, which was to collect cases of complication resulting from acupuncture treatment, Dr. Epstein could relate only the one, much discussed case involving a punctured lung, insofar as acupuncture complications have occurred from treatments given in the District of Columbia. The other two cases involving medical complications about which he testified arose somewhere in the Metropolitan Washington area, not specifically the District of Colum-

bia (see p. 111, May 30th hearings). Similarly, Dr. Glen Gilhoed related at the May 30th hearings his personal experience with four patients who had developed complications as a result of acupuncture treatments. However, he further stated that two of these patients were treated in the "Washington area," and two of the patients were from out of the area completely (see p. 114, May 30th hearings).

Relating to the question of the inherent dangers of acupuncture treatment, the committee also heard testimony concerning the treatment procedures employed by the various clinics. The evidence before the committee established that the 1972 policy statement was probably not being strictly followed in the sense that a licensed physician was actually physically present at all times throughout the administration of the treatment. The record presented to the committee revealed, however, that while a physician was not necessarily in the treatment cubicle during the acupuncture therapy, he was actually in attendance at various stages of the treatment and was usually in close proximity at all times to the patient undergoing treatment. The thrust of the testimony here was the difference in opinion among the witnesses as to the quality of supervision which should be exercised by the physician in his role of providing patient care, more specifically those who felt that the physician should actually be physically present during the entire period acupuncture therapy was administered, and those who felt that a physician, after proper diagnostic procedures, could direct treatment of the patient through the services of an acupuncturist working under his supervision.

6. The Court notes, in connection with the Medical Society's position, the testimony of Dr. Gruver (p. 155) which related that the Medical Society has been unsuccessful thus far in persuading the medical schools to establish such research centers for acupuncture experimentation. Similar testimony was offered by Dr. Barrington Barnes, President of the Medico-Chirurgical Society of the District of Columbia (p. 25). Furthermore, Dr. Robinson, in his report of the committee hearings to the City Council, stated:

The position taken by the D. C. Medical Society, as announced in its March 26, 1973 policy statement, is to the effect that the administration of acupuncture is an experimental procedure and, as such, research should be conducted only in an institution having a committee on human research, such as a medical school or its affiliated hospital, by qualified investigators under the usual limitations imposed on human experimentation. (A "qualified investigator" is defined as one who is licensed to practice medicine and surgery in the District of Columbia and by virtue of his training, knowledge, and experience is adequately and properly informed in the particular field or subject of his experimental investigation.) Dr. Clifton R. Gruver, President of the D. C. Medical Society, testified at the May 30th committee hearing (p. 98) that this position was taken primarily because "very little is known about the effects of acupuncture, how, why, when it works." [6]

The Committee also heard extensive testimony from Medical Society doctors and those connected with the acupuncture clinics which emphasized the importance and need for skilled acupuncturists and the necessity of establishing controls to ascertain and verify the qualifications of those employed at the clinics. With varying degrees of emphasis, most witnesses testifying on this point seemed to agree before the committee that current regulations were inadequate to insure that acupuncture clinics were properly staffed with competent personnel, but they differed significantly in their views of who should be qualified to engage in acupuncture and exactly how they should be so qualified by a District medical licensing authority.

To date, the local medical schools have not given the Committee any concrete evidence of their willingness to cooperate with the Medical Society's recommendation that acupuncture be affiliated with ongoing human research committees.

Yet testimony was elicited and research findings offered into evidence as to support plaintiffs' contentions that the acupuncture clinics are setting up research protocol, documenting their findings and attempting to publish the results of their therapy on certain conditions and disorders.

On the basis of the two days of committee hearings, Dr. Robinson appeared five months later before the City Council and presented a highly abbreviated and selective statement as to the testimony presented to his committee. A transcript of the May 28th and 30th committee hearings was not made available to the City Council at any time during its hearings or vote on the regulation. In his written report, unsigned by other members of his committee, Dr. Robinson spoke of the emotional statements of the patients who had undergone acupuncture treatments. He stressed the fact that many of these people were non-District of Columbia residents and that clinics were proliferating in the District of Columbia; and he placed great emphasis on certain testimony relating to acupuncture therapy for deafness and possible exaggerated claims relating thereto. The report related to the Council almost no testimony concerning serious health risks in acupuncture, the need for patients to receive this type of treatment, the effect the proposed regulation would have on physician-patient rights, or the reasonableness of the particular regulation proposed. The underlying tone of the report was that Western medicine has so little scientific experience with acupuncture that the adoption of this restrictive regulation would give the Council additional time to determine what, if any, regulation was needed.

In its hearings on the regulation, the City Council heard only from Dr. Robinson. The debates revealed that the Council was concerned about the qualifications of the personnel employed by the acupuncture clinics, as well as the possible ramifications the proposed regulation would have on patients who seek necessary acupuncture treatments. The Council, prior to enacting Regulation No. 74–38, rejected, 4–3, a proposal to permit the continued administration of acupuncture under the guidelines previously enunciated in the 1972 statement by the Commission on Licensure.

### E. Rights and Interests of the Parties Involved

It is in the light of this background and the objectives of the challenged regulation that the Court must examine the various rights and interests of the parties involved in order to then determine how the regulation affects them and whether it does so within constitutionally permissible bounds.

### 1. The Public Interest

The police power is an inherent attribute of governmental sovereignty (*Ohio v. Helvering*, 292 U.S. 360, 54 S.Ct. 725, 78 L.Ed. 1307 (1934)); and its proper exercise is for the purpose of promoting the general welfare, comfort and convenience of the people (*East New York Savings Bank v. Hahn*, 326 U.S. 230, 66 S.Ct. 69, 90 L.Ed. 34 (1945)). Courts have long recognized that legislative enactments which relate to the protection of public health and, more specifically, to the regulation of the medical profession are a proper function of that power (*Dent v. West Virginia*, 129 U.S. 114, 9 S.Ct. 231, 32 L.Ed. 623 (1889); *Crane v. Johnson*, 242 U.S. 339, 37 S.Ct. 176, 61 L.Ed. 348 (1917); *Williamson v. Lee Optical*, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955); *Campbell v. State*, 12 Wash.2d 459, 122 P.2d 458 (1942); *Ice v. Indiana*, 240 Ind. 82, 161 N.E.2d 171 (1959); *Collett v. Errington*, 317 S.W.2d 326 (Mo.1958); *Blumenthal v. Bd. of Medical Examiners*, 57 Cal.2d 228, 18 Cal.Rptr. 501, 368 P.2d 101 (1962); *People v. Amber*, 76 Misc.2d 267, 349 N.Y.S.2d 604 (1973); 1973 D.C.Code § 2–101 et seq.).

We have found in part I of this opinion that acupuncture comes within the purview of the Healing Arts Practice Act and that the D. C. City Council has the authority to promulgate regulations in connection thereto. The regulation in question goes directly to the protection of the public health interest. This Court is cognizant of its duty under the principles noted at the outset that we should give due deference to the City Council's determination that this regulation is necessary to protect the health interests of this community. Under these same principles, however, the City Council may not, in the exercise of its police power, unnecessarily and unreasonably interfere with legally recognized rights of the medi-

cal profession or the public. *Johnston v. Bd. of Dental Examiners,* 77 U.S.App.D.C. 119, 134 F.2d 9 (1943).

### 2. *Interests of Plaintiff Doctors*

Plaintiffs contend that Section 1 of Regulation No. 74–38, by limiting the practice of acupuncture to physicians and dentists licensed to practice in the District of Columbia, has the effect of depriving them of their basic right guaranteed by the Fifth Amendment of the Constitution of the United States to follow a chosen profession free from unnecessary governmental interference. Specifically, plaintiffs Louise O. Wensel and Ralph N. Coan, licensed physicians in the District of Columbia, contend that this regulation deprives them of the right to administer acupuncture treatments to their patients by utilizing the services of skilled and qualified acupuncturists. They argue that the regulation deprives them of their right to administer necessary health care to their patients in accordance with their best professional judgment and, as such, constitutes an unreasonable governmental interference with the practice of their chosen profession.

"The right to hold specific private employment and to follow a chosen profession free from unreasonable governmental interference comes within the 'liberty' and 'property' concepts of the Fifth Amendment." *Greene v. McElroy,* 360 U.S. 474, 492, 79 S.Ct. 1400, 1411, 3 L.Ed.2d 1377 (1959); see also, *Schware v. Bd. of Law Examiners,* 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957); *Smith v. Texas,* 233 U.S. 630, 34 S.Ct. 681, 58 L.Ed. 1129 (1914). This right clearly applies to the practice of medicine; and with increasing frequence courts are recognizing today that a medical practitioner has the right to exercise a reasonable choice in the method of treatment necessary for his patient's benefit free from unreasonable interference by governmental authorities. *England v. Louisiana State Bd. of Medical Exam.,* 259 F.2d 626, 627 (5th Cir. 1958); *Blumenthal v. Bd. of Medical Examiners, supra* ; *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 149 (1973); *Doe v. Bolton,* 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973); *Nyberg v. City of Virginia,* 495 F.2d 1342 (8th Cir. 1974); *Hodgson v. Anderson,* 378 F.Supp. 1008 (Minn.1974); *Ward v. Poelker,* 495 F.2d 1349 (8th Cir. 1974); *Friendship Medical Center v. Chicago Bd. of Health,* 505 F.2d 1141 (7th Cir. 1974). While many of the recent cases have arisen from the aftermath of the Supreme Court's abortion decisions, the trend of cases all enunciate a similar principle applicable here—that professional medical standards and the physician's best medical judgment relating to the needs of his patient are the criteria by which procedures of medical care are to be judged, and the state cannot unduly infringe upon that area absent a strong showing of need. In *Roe v. Wade, supra,* the Supreme Court spoke of the "right" of the physician to determine according to his medical judgment whether his patient needed an abortion free of any state overview prior to the time when state interests may permissibly intervene. Similarly, in *Doe v. Bolton, supra,* the Supreme Court struck down various state regulations which interfered with the physician's right to practice. Illustrative language from *Doe* includes the following excerpt discussing a Georgia regulation requiring a physician to obtain two outside doctors to confirm his medical judgment on a possible abortion for his patient (410 U.S. at 199–200, 93 S.Ct. at 751):

The statute's emphasis, as has been repetitively noted, is on the attending physician's "best clinical judgment that an abortion is necessary." That should be sufficient. The reasons for the presence of the confirmation step in the statute are perhaps apparent, but they are insufficient to withstand constitutional challenge. Again, no other voluntary medical or surgical procedure for which Georgia requires confirmation by two other physicians has been cited to us. *If a physician is licensed by the State, he is recognized by the State as capable of exercising acceptable clinical judgment. If he fails in this, professional censure and deprivation of his license are available remedies. Re-*

*quired acquiescence by co-practitioners has no rational connection with a patient's needs and unduly infringes on the physician's right to practice.* The attending physician will know when a consultation is advisable—the doubtful situation, the need for assurance when the medical decision is a delicate one, and the like. Physicians have followed this routine historically and know its usefulness and benefit for all concerned. It is still true today that "[r]eliance must be placed upon the assurance given by his license, issued by an authority competent to judge in that respect, that he [the physician] possesses the requisite qualifications." *Dent v. West Virginia,* 129 U.S. 114, 122–123, 9 S.Ct. 231, 233, 32 L.Ed. 623 (1889). See *United States v. Vuitch,* 402 U.S., at 71, 91 S.Ct. [1294] at 1298 [28 L.Ed.2d 601.] [Emphasis supplied.]

The Supreme Court stressed, as have the relevant cases cited above, that the physician needs room to evaluate and treat his patient because only he can provide the medical judgment and treatment necessary in light of all the physical, emotional, and psychological factors present.

The physician plaintiffs herein clearly have standing to assert "their constitutional rights to practice medicine" in challenging the validity of this regulation. *Nyberg v. City of Virginia, supra,* at 1344. Cf. *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972).

### 3. Interests of Plaintiff Acupuncture Patients

Plaintiff Clare E. Urie, a patient of the Acupuncture Center of Washington, and plaintiff Friends of Acupuncture (a nonprofit District of Columbia corporation composed of approximately 1,000 individual acupuncture patients) assert that Section 1 of Regulation No. 74–38 effectively deprives them of their right to receive adequate medical treatment of their own choosing and which is necessary for their own well-being.

The majority of patients who testified before Dr. Robinson's committee indicated that they had tried acupuncture as a last resort after having tried and found little or no relief through drugs and traditional Western medical procedures. The record before the Court indicates that there are patients who are in need of periodic treatments and are in the midst of being sustained in an improved condition by this modality of treatment. The Court record indicates that skilled training in the art of acupuncture is available in few, if any, American medical or dental schools. Rather, such professional training can be obtained generally only in Oriental medical schools and in certain instances through the European medical community. Because of such limited available training, the testimony of the physicians before the committee and this Court brought out the stark fact that there are, at most, 8 licensed physicians in the District of Columbia skilled in the art of acupuncture administration, and virtually no licensed dentists so trained or skilled. The significance of this to the interests of the plaintiff patients is highlighted by the testimony of Dr. Louise O. Wensel, the Director of the Washington Acupuncture Center (which began operation in April 1973), which brought out the fact that over 8,000 patients have received acupuncture treatments there. Also, Dr. Ralph Coan, Medical Director of the Acupuncture Center of Washington (which began operation in December, 1972), testified that approximately 6,000 patients were treated in the clinic's first year of operation. Some of the conditions treated were multiple sclerosis, headaches, rheumatoid arthritis, osteoarthritis, nerve deafness, low back syndrome, cervical spine syndrome and miscellaneous bone and joint problems.

There is, of course, no "right" to good health; and there are no cases which delineate the absolute right to receive specific medical treatment. Cf. *Rouse v. Cameron,* 125 U.S.App.D.C. 366, 373 F.2d 451 (1967); *Millard v. Cameron,* 125 U.S.App.D.C. 383, 373 F.2d 468 (1966); compare also, *Friendship Medical Center v. Chicago Bd. of Health, supra;* *Denise R. v. Lavine,* 39 N.Y.2d 279, 383 N.Y.S.2d 568, 347 N.E.2d 893 (N.Y.Sup.Ct.App.Div. 2nd Dept.1975).

However, the law has become clear as of late—particularly in light of the cases noted above relating to physicians' rights—that when a person is involved in a doctor-patient relationship, that relationship cannot be disturbed by governmental regulation, absent a reasonable basis on the grounds of public health, safety or welfare. "Under all of the cases, * * * the state cannot deny to any individual the right to exercise a reasonable choice in the method of treatment of his ills * * *." *England v. Louisiana State Bd. of Medical Exam., supra*, at 627. See also, *Hodgson v. Anderson, supra*, at 1016, which speaks of the patients' right—in connection with the physicians' judgment—to receive a reasonable modality of treatment necessary for their welfare. So too, in *Doe v. Bolton, supra*, and *Roe v. Wade, supra*, the Supreme Court spoke not only of the physician's interests, but equally importantly it held as unconstitutional the state regulations involved on the basis of their interference with the patients' rights. *Doe v. Bolton, supra*, focused on this aspect at one point as follows (410 U.S. at 197–198, 93 S.Ct. at 750):

> The woman's right to receive medical care in accordance with her licensed physician's best judgment and the physician's right to administer it are substantially limited by this statutorily imposed overview. * * *
>
> We conclude that the interposition of the hospital abortion committee is *unduly restrictive of the patient's rights and needs that, at this point, have already been medically delineated and substantiated by her personal physician. To ask more serves neither the hospital nor the State.* [Emphasis supplied.]

We are confronted here with a regulatory provision which was enacted as an interim measure for a one-year period (now 8½ months) during which the District of Columbia was to develop licensing criteria for nonphysician acupuncturists and minimum standards for clinics specializing in acupuncture treatment. This measure, instead of maintaining the status quo, had the immediate effect of superseding the 1972 policy statement under which physicians in the District of Columbia were specifically authorized to utilize acupuncturists in the treatment of their patients and in reliance thereon many individuals received medically prescribed acupuncture therapy.

From the evidence adduced before this Court and from the record of Dr. Robinson's committee, the medical position in which the plaintiff acupuncture patients find themselves is basically uncontradicted. After attempts to have their ailments treated by more traditional Western medical practices, these patients finally began to obtain some measure of relief through acupuncture therapy. Indeed, Dr. T. M. Kao, Board-Certified in Rehabilitation Medicine, a clinical assistant Professor of Rehabilitation Medicine at Georgetown University School of Medicine, Chief of Treatment Division at District of Columbia Village and a member of the D. C. Medical Society and the American Society of Chinese Medicine, indicated in his testimony before the May 28th evening session of the committee hearings that acupuncture's "lack of side effects, if practiced properly, along with its therapeutic efficacy may make it the treatment of choice in certain clinical situations, especially in the treatment of pain syndrome." (See p. 20, May 28th evening session hearings.) Acupuncture treatment, similar to many other types of medical therapy, is an ongoing process, however, and many patients would suffer regenerative effects from the cutoff of further acupuncture treatments. In light of the large number of patients who seek and presently need this type of medical help and the availability of only a handful of qualified licensed physicians in the District of Columbia who could directly administer such therapy, as would be required by Section 1 of the regulation, it is obvious that Section 1 works a severe restriction on the plaintiff patients' right to receive medical treatment as dictated by their personal physicians. This Court accepts the characterization of the effect of the regulation, as amply supported by all the evidence before it, contained in Dr. Coan's affidavit which was submitted in support of a temporary restraining order:

\* \* \* [T]he Regulation \* \* \* would \* \* \* interfere \* \* \* with the health and well-being of my patients in that many patients would suffer severe and recurrent pain, would become immobilized, some may return to drug addiction which acupuncture treatment has eliminated, and some may possibly consider suicide. For example, certain patients with rheumatoid arthritis have noted lessening of swelling of joints, reduction of tenderness, pain and medication, but only for a few months after each course of treatment. Some patients with chronic incurring migrane headaches have had six to eight months of relief but then a recurrence of headache without continued acupuncture treatment. Others with osteoarthritis of the neck, shoulders, low back and/or knee have had similar successful treatment. There are a number of patients with multiple sclerosis \* \* \* who have sustained pain relief, lessening of double vision and increase of visual acuity, greater strength in the legs, better balance, less bladder spasm and less skin numbness. In short, certain patients require constant and continuing treatment [on a periodic recurring basis].

Further support for the continuing nature of the plaintiff patients' need for acupuncture therapy is found in the testimony of Dr. Shalom Albert, Vice Chairman of the Department of Anesthesiology at Greater Southeast Community Hospital. Dr. Albert stated that after having been trained in the art of acupuncture in France, he administered acupuncture treatments at the hospital. Of those patients treated, 95 percent showed favorable results, but their improvement was generally only of about three months' duration.

Concomitant with the highly restrictive effect of the regulation on the plaintiff patients' right to receive medical treatment is also its interference with the right of plaintiff physicians to administer necessary health care to their patients in accordance with their best professional judgment. Since there are so few licensed physicians in the District of Columbia who have any significant knowledge about acupuncture and almost none who are qualified to administer such treatments themselves, doctors must, of necessity, rely on others so qualified to perform the actual insertion of the needles. By outlawing this avenue, which the physician in his qualified best medical judgment dictates is the proper course of treatment, the regulation denies the doctor his right to provide a reasonable method of care for the health needs of his patient.

Acupuncture is unique in the sense that, while a licensed physician is qualified to diagnose the need for and to prescribe this type of treatment for his patients, most physicians lack by training and expertise the ability to effectively administer such therapy. Yet, Section 1 of Regulation No. 74–38, drafted in terms of a general licensure requirement, has a most questionable effect on the rights of the persons involved. Instead of having the usual effect of insuring that medical procedures will be performed only by individuals duly qualified to administer them, it creates the anomalous situation whereby individuals who for the most part are totally unqualified by training and experience are alone authorized to engage in the actual administration of this therapeutic modality of treatment. By such a provision this regulation operates then to cut-off, almost *in toto*, the rights of physicians to provide modes of treatment they deem necessary for their patients and the rights of patients to receive such treatment under the care and supervision of their doctors.

That the regulation severely interferes with the rights of physicians and patients is clear. It is necessary, therefore, to determine whether the regulation is nevertheless valid as a proper exercise of the City Council's police power.

### G. Rationality of the Regulation

In our review of the applicable legal standards, we noted that the regulation herein must be upheld if there is a rational relationship between its actual operative effect as enacted and the purpose it was designed

to achieve. We have earlier seen that the regulation had a twofold purpose: (1) to remedy certain professional medical ethical abuses allegedly arising from the operation of acupuncture clinics in the District of Columbia, and (2) to meet health risks allegedly endangering the public from the use and administration procedure in acupuncture therapy.

The record, however, does not support a finding that the effect of Section 1 of the regulation is rationally related to any valid legislative purpose presented to the committee and the City Council.

In this connection we examine first the more significant health related purposes. Are acupuncture treatments inherently a danger to the health and welfare of the community? As we previously noted, few physicians who testified could relate any specific health complications caused by acupuncture treatments in the District of Columbia. Of the 8,000 patients treated at the Washington Acupuncture Center since 1972, the incidence of medical complications does not appear to be greater than those found in other comparable medical procedures. Testimony by plaintiff, Dr. Coan, indicated that, of the 7,000 patients who have received treatments at the Acupuncture Center of Washington, none has developed serious medical complications as a result of acupuncture therapy. It should be noted that this testimony relates to two of the four acupuncture clinics in operation since the enactment of Regulation No. 74–38—the number of clinics in operation having apparently dropped from the record thirteen in early 1974.

Testimony by C. Francis Murphy, Esquire, who is both a member of the Commission on Licensure to Practice the Healing Art and the Corporation Counsel for the District of Columbia, revealed that no complaint had been received by the Commission or his office from health authorities, patients or individual physicians regarding the specific treatment administered to acupuncture patients. This testimony was substantiated by Dr. Robinson in his testimony in open court, and by Mrs. Tebitts of the Department of Human Resources in her testimony before the Committee on Health, Welfare and Aging. Mrs. Tebitts indicated that any complaints received by her Department related solely to the operation of the clinics rather than to medical complications resulting from acupuncture therapy. The record is devoid of evidence of unique or special medical health hazards posed by acupuncture vis-a-vis any other recognized mode of medical therapy. As previously noted, a number of physicians testified on behalf of the D. C. Medical Society in order to inform the committee as to the inherent dangers in the practice of acupuncture. These witnesses (including Dr. Burton Epstein, former Chairman of the Ad Hoc Committee on Acupuncture for the D. C. Medical Society and for the American Society of Anesthesiologists, which was to collect cases of complication resulting from acupuncture treatment) could relate only a small number of cases in which patients developed any medical complications as a result of acupuncture therapy. Of this limited number of cases, only one could be shown to be the result of acupuncture therapy administered in the District of Columbia. The Court finds on this entire record that the incidence of actual serious medical complications arising from acupuncture therapy in the District of Columbia is insufficient to warrant a finding of an actual health hazard posed to the citizens of the District of Columbia by the modality of acupuncture therapy itself.

In reaching this conclusion, the Court notes the possible greater incidence of serious medical complications resulting from alternative modalities of medical treatment—such as the administration of drugs with occasional severe adverse side effects, nerve destruction in some surgical procedures and complications arising from the administration of anesthesia. Dr. Shalom Albert further related under cross-examination that, although deaths have occurred in the District of Columbia in the past two years as a result of the administration of anesthesia, he knew of no fatalities as a result of the administration of acupuncture. Further, the evidence suggests that whatever hazards may exist solely from the use

of needles for acupuncture therapy, they are to some extent similarly present in the use of needles by the several hundred unlicensed medical technicians who draw blood and take other specimens, as well as give injections. Dr. Mary Matthews, a pathologist and professor at George Washington University Hospital, testified that these medical technicians routinely insert needles without the presence or supervision of a physician. Dr. Matthews further testified that the possibility of medical complications developing, at least insofar as the use of needles was concerned, was more likely in the work of these medical technicians than through the administration of acupuncture therapy because the needles used by the technicians are generally twice as long as those used in acupuncture (2 mm. needles as opposed to acupuncture needles of less than 1 mm.).

In considering the rationality of this regulation, the Court takes note of the state of the record before the City Council. At the time this matter came before the Court, no transcript had been made of the public hearings held on May 28th and 30th, 1974, by the Committee on Health, Welfare and Aging regarding the practice of acupuncture in the District of Columbia. In fact, it was only upon a court order making this testimony, along with the written statements submitted to that committee, a part of the record in the instant case, that these proceedings were finally made available in transcript form. Yet, even after such action by the Court, final oral arguments in the case had to be postponed for two weeks while the District endeavored to find and produce the evening session of the May 28th committee hearings. This transcript was finally made available to the Court and the parties, and included some of the most compelling testimony on record in the case.

Needless to say, a transcript of the committee hearings was in no way made available to the City Council prior to their December 3, 1974 vote to enact Regulation No. 74–38. Rather, at that time, the only information on these public hearings before the City Council was a brief report on the hearings prepared by the committee chairman, Dr. Robinson. While it is true that when a duly authorized committee conducts hearings within an area of its authority, it may merely report its findings and recommendations to the legislative body, it is imperative that the committee's report give a full and accurate summary of the hearings held. The Court, having made a careful examination of the public hearings by the Committee on Health, Welfare and Aging, along with the written statements submitted to that committee, finds that the report submitted to the City Council gave a most delimited and circumscribed view of these acupuncture hearings, a view which did not fully reflect the flavor of the testimony and the interests affected by the recommended legislation.

Insofar as reflecting the interests of patients, Dr. Robinson related in his report to the Council that "most of the patients who testified related emotional experiences regarding their physical relief attributed to acupuncture treatments." Yet, he passed over other medical testimony which supported "objective" rather than subjective experiences. He stressed the fact that many of the patients who testified were nonresidents, yet the issue before the committee was not to whom treatments were given, but rather the quality thereof. Most importantly, he did not relate the constant and continuing nature of the treatments these patients were receiving, testimony which the Council could have found most helpful in enacting a reasonable regulation for the interim period while criteria for licensure and standards for clinics were to be developed.

In his report to the Council, Dr. Robinson placed great emphasis on certain testimony regarding the use of acupuncture therapy for the treatment of nerve deafness and its apparent lack of effectiveness. Yet, he did not reflect contrary testimony which suggests that this area, more so than any other, encompasses a medically debatable issue on the efficacy of acupuncture treatments for such hearing disorders. Furthermore, in emphasizing the treatment of nerve deaf-

ness to such a degree, he failed to adequately report the favorable testimony adduced regarding the efficacy of acupuncture in treating other diseases and disorders. Of particular importance was the extensive testimony offered regarding the use of acupuncture for the treatment of chronic pain syndrome resulting from various conditions such as migraine headaches, arthritis, bursitis, sciatica, etc.

Dr. Robinson, in urging the Council to enact a regulation limiting the practice of acupuncture to licensed physicians and dentists for the one-year interim period, furthermore did not accurately reflect either the testimony of certain medical experts or his own testimony regarding the reasonableness of such a regulation. For instance, the Chief Medical Officer of the District of Columbia, Dr. Raymond Standard, made no such recommendation to Dr. Robinson's committee. Rather, at page 5 of the May 28th transcript he is quoted as stating:

* * * It is my view, however, that the city government should not discard or reject the practice of this procedure in the District of Columbia based on the lack of theoretical conclusions at present. Acupuncture treatment should be available to those who desire solace from it.

And Dr. Robinson by his own testimony on two separate occasions questioned the reasonableness of this restrictive provision for the interim period. On page 16 of the transcript of the May 28th evening session in directing a question to Dr. Rosen, he stated as follows:

Chairman Robinson: Well, now, all of our acupuncturist clinics in the District have to be run by a licensed M.D. of the District of Columbia. He is supposed to be present at all treatments. We found out that they are not always there but they are within a minute or so of a call if needed. Now since,—well, it seems apparent, doctor, to me, that we say that the American M.D.'s haven't had any training or very little training in acupuncture. Yet they have to supervise the acupuncture treatments and they know nothing about it. How do we get around that, see?

Dr. Rosen: Well, that's stupid.

Dr. Robinson: It is sir!

And then again on page 86 of the same transcript Dr. Robinson stated to plaintiff herein, Dr. Ralph M. Coan, as follows:

I don't agree with the fact but as the law is written now you can do all the acupuncture that you want. A man can do it in his office but it has to be an M.D. that does it. I don't agree the way this is, but I am talking about those people that you supervise that are not M.D.'s.

Thus, it seems apparent that Dr. Robinson, in urging the Council to enact Section 1 of Regulation No. 74–38, did not accurately reflect the irrationality he himself saw in such a provision, much less the interests such a restrictive provision would adversely affect in its practical application.

In this connection, the testimony of Dr. Emerson C. Walden, a member of the American College of Surgeons, and the former President of the National Medical Association who, in that capacity, visited the People's Republic of China in October, 1972, is pertinent. This testimony was not included in the committee chairman's report to the City Council. During the May 28th evening session of the committee hearings, in addition to relating many of the therapeutic possibilities of acupuncture, particularly with regard to its use in the relief of pain and disability, Dr. Walden elaborated on the concept of physician delegation in delivering total health care to the patient. According to his testimony many of the difficulties associated with our society's health care crisis relate to the lack of available primary health care personnel. According to Dr. Walden, physicians in practice do not desire nor can they be expected to perform individually or professionally all of the functions involved in patient care. As a means to alleviate this problem, Dr. Walden suggests that the physician, in his central role of management and responsibility for the patient's welfare, delegate not his own tasks but rather those health services viewed in terms of patient care which can be administered by nonphysicians. Ac-

cording to Dr. Walden, "It is in this context that acupuncture should and must be viewed (a health service under the management and responsibility of physicians). To view acupuncture in the task delegation sense is again to mechanize the role of the physician and do little to enhance patient care." Dr. Walden, noting that there are few physicians who can practice acupuncture even in theory, summarizes his position as follows:

> Such being the case, a conflict between patient care and the task performance role of the physician necessarily arises. If in fact acupuncture is a beneficial service in patient care, and the task performance role of the physician is held paramount, and physicians cannot in fact function (perform) as acupuncturists, then patient care must suffer, which is in conflict with the goals and purposes of physicians in our health system.
>
> On the other hand, viewing the physician's central role as one of management and responsibility, such conflict does not need to arise, for there does exist a means to ensure the availability of acupuncture services in patient care via the use of nonphysician acupuncturists practicing under the management and responsibility of physicians * * *.

The evidence in this record is inadequate to support a finding by this Court that the restrictive provisions of Section 1 of this regulation rationally relates to the public health care objectives sought with respect to the use of acupuncture. The difficulty with Section 1 is that it seeks to remedy a danger which has not been shown to exist (i. e., that acupuncture is inherently hazardous) by means which are not rationally related to such a purpose. An appropriate analogy might be drawn to a regulation banning the use of x-rays in the District of Columbia upon a finding that improper administration of x-ray may cause medical complications. While some protection would theoretically be afforded the public by limiting the practice of acupuncture to licensed physicians and dentists in that the patient would be assured that the individual administering the treatment was trained in

anatomy, immunology, physiology and other basic medical sciences, the regulation is immediately stripped of its rationality by the almost total lack of physicians and dentists licensed in the District qualified to administer acupuncture. Purportedly enacted in the interest of protecting the public health, the regulation ironically authorizes any licensed physician or dentist to administer acupuncture treatments notwithstanding their total lack of any practical or theoretical knowledge as to the art of acupuncture.

The regulation is also directed at problems relating to the procedures employed in the administration of acupuncture by the various clinics in the District of Columbia. It is in connection with this issue that the committee and Council evidenced a concern over the qualifications of the acupuncturists employed by the treating physicians. It is clear to this Court that there was ample evidence before the committee and Council relating to the need for licensing requirements and standards of practice to be followed by acupuncture clinics. In this connection, it appeared that the 1972 policy statement of the Commission on Licensure was evidently not being technically followed by the clinics in the sense that a licensed physician was actually physically present at all times throughout the administration of the treatment. It further appeared, however, that the physician would usually be in attendance at various stages of the treatment and at other times would be in close proximity to the patient.

Accordingly, the Court finds that the present lack of any published standards to ascertain the qualifications of acupuncturists-therapists in the District of Columbia raises a sufficient potential health risk to warrant the adoption of Section 2 of the Regulation No. 74–38 requiring the Department of Human Resources to develop an examination and criteria for licensure of practitioners of acupuncture within one year. Pending development of these criteria, the medical ethical requirement that the therapists who are employed by a physician be adequately qualified to administer treatment directed by him, as well as the

self-discipline and integrity of the medical profession, would seem to offer a proper safeguard for the community health. See *Doe v. Bolton, supra,* 410 U.S. at 200, 93 S.Ct. 739. While Section 2 is rationally related to this health care problem, Section 1 obviously is not, for the reasons outlined previously in considering the question of possible health risks inherent in acupuncture. Section 1, by eliminating the opportunity of physicians to prescribe and of patients to receive acupuncture therapy, even where the physician in his best judgment is satisfied that it will be administered in a qualified manner, does not rationally relate to this concern.

We turn finally to the other basic purpose of this regulation, namely, the need to remedy possible ethical abuses involved in the practice of acupuncture in the District of Columbia, e. g., ownership of the clinics, advertising and treatment for financial gain. The record made at the public hearings and before this Court reveals at most the possibility that some unspecified physicians and centers may have engaged in unethical practices and some clinics may have been managed by individuals of questionable reputations. The mere possibility that such abuses may be substantiated by further investigation is a matter of proper concern to the District of Columbia Government and consequently the adoption of Section 3 of Regulation No. 74–38, requiring the Department of Human Resources to recommend minimum standards for clinics within six months, was a proper and rational exercise of legislative authority. Pending the development of the criteria relating to clinics pursuant to Section 3, many of the abuses fall more properly within the ambit of medical ethics and can be handled through appropriate disciplinary hearings within the medical profession. Further, the Corporation Counsel testified that his office is ready and able to deal with some of these alleged problems which may constitute violations of the Healing Arts Practice Act. To the extent that Section 1 of the regulation was promulgated to meet these ethical abuses, it is the finding of the Court that this provision has no rational relationship to that purpose. By restricting the practice of acupuncture to physicians, Section 1, which in no sense deals with the ownership of clinics or the use of advertisements, lacks a reasonable relationship to the objective of eliminating the problem of unethical practices by physicians and others engaged in the operation of acupuncture clinics.

### H. *Conclusion*

We have examined Regulation No. 74–38 fully aware of the strong presumption favoring its constitutionality, *McDonald v. Bd. of Education, supra,* and have reviewed the entire record in an effort to find support for a construction of the regulation which would sustain its validity, *Screws v. United States, supra.* This Court is able to make such a finding regarding Sections 2 and 3 of the regulation; however, we are satisfied that the plaintiffs have met the required heavy burden in their challenge to Section 1, *Von Stauffenberg v. D. C. Unemp. Comp. Bd., supra.*[7]

The law recognizes that physicians have the right to evaluate the needs of their patients and prescribe a reasonable mode of medical care without state interference, absent a clear and reasonable public need, *Doe v. Bolton, supra.* The authorities in their concern with the efficacy and safety of acupuncture have not shown that this mode of treatment presents unique health risks when compared with other medical procedures which are neither inherently dangerous in themselves nor as administered by medical technicians under the care and supervision of a licensed physician, who has initially made the diagnosis and prescribed such treatment.

---

7. Since we hold Section 1 unconstitutional on the basis that it lacks a rational relationship to a proper legislative purpose, this Court need not rule on the plaintiffs' allegation regarding that section's discriminatory effect against Orientals as a class, nor on the allegation that the section infringes on plaintiffs' First Amendment "right to know" regarding their investigation and research with respect to acupuncture.

Section 1 of Regulation No. 74–38, therefore, by interfering with a doctor's right to obtain acupuncture therapy for his patients through the services of an acupuncturist he finds qualified to administer such treatment under his supervision and control, severely restricts the rights of the medical profession without any rational basis therefor.

So too Section 1 interferes with the rights of patients to receive reasonable medical care by ending, for all practical purposes, the opportunity to receive prescribed acupuncture therapy under the care and supervision of their treating physicians in the District of Columbia for one year without any rational basis therefor. *England v. Louisiana Bd. of Medical Exam., supra; Doe v. Bolton, supra.*[8]

In summary, this Court finds that the D. C. City Council had the authority to adopt this regulation. It also finds that Sections 2 and 3 of Regulation No. 74–38 are directly and reasonably related, on their face and in their operation, to valid legislative interests concerning medical ethics and the operation of health care facilities. Therefore, Sections 2 and 3 must be declared constitutional as a valid exercise of the Council's legislative police power. The Court, however, further finds that, since the restrictions engendered by Section 1 of Regulation No. 74–38 on physicians and patients' rights cannot meet the due process standard as legitimate and reasonable for the protection of recognized state interests in promoting the health and safety of the citizens of the District of Columbia, Section 1 cannot be sustained.

In concluding, the Court notes that the practice of acupuncture is not left unregu-

lated here by the invalidation of a portion of Regulation No. 74–38. The District has ample means to deal with the unauthorized practice of medicine and to monitor institutions providing health care services. In any event, the newly elected City Council now has it within its power in implementing Sections 2 and 3 of Regulation No. 74–38 to enact any legislation deemed appropriate.

Section 1 of Regulation No. 74–38 is hereby declared unconstitutional and defendants are permanently enjoined from enforcing that section of the regulation.

Sections 2 and 3 of Regulation No. 74–38 are declared valid.

/s/ Fred B. Ugast
Fred B. Ugast
Judge

April 10, 1975.

Copies to:

David Carliner, Esq.
1709 New York Avenue, N.W.
Washington, D. C.

Ira C. Wolpert, Esq.
1140 Connecticut Avenue, N.W.
Washington, D. C.

Morris Kletzkin, Esq.
Asst. Corporation Counsel
John Lewis Smith, III
500 Southern Bldg.
Washington, D. C. 20005

---

[8]. Indeed, its operation would have the effect on many patients of causing them to suffer severe hardship and "grievous loss," cf., *Goldberg v.* *Kelly*, 397 U.S. 254, 264, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).