Robert J. SHERMAN, Petitioner,

v.

COMMISSION ON LICENSURE TO PRACTICE the HEALING ART, Respondent.

No. 12556.

District of Columbia Court of Appeals.

Argued March 14, 1979.

Decided Oct. 4, 1979.

---

John W. Karr, Washington, D. C., for petitioner.

Edward E. Schwab, Asst. Corp. Counsel, Washington, D. C., with whom Louis P. Robbins, Acting Corp. Counsel, Washington, D. C., at the time the brief was filed and the case was argued, and Richard W. Barton, Deputy Corp. Counsel, Washington, D. C., were on brief, for respondent.

Before KELLY, HARRIS and MACK, Associate Judges.

KELLY, Associate Judge:

Petitioner Sherman's medical license was revoked by the District of Columbia Commission on Licensure to Practice the Healing Art [the Commission]. The Commission's reliance on inappropriate findings of fact and conclusions of law requires that we remand the case for more specific conclusions.[1] We order this limited remand reluctantly, for the Commission held fair and extensive hearings and substantial evidence was presented to support a determination that Dr. Sherman's medical license should be revoked under any reasonable standard.

The Commission's conclusions of law in the revocation proceedings do not make clear the standards of conduct applied to Dr. Sherman, nor do they indicate the significance of the improper evidence upon which the Commission chose to rely.[2] Its findings and conclusions thus do not meet the criteria established by the District of Columbia Administrative Procedure Act [DCAPA]. D.C.Code 1978 Supp., § 1–1509(e).[3] And we cannot ourselves make such findings, for "[e]ven though there may be evidence in the record . . . this

---

1. On remand the Commission, may, if it so chooses, open the record to further evidence from both sides. *Cf. Washington Public Interest Organization v. PSC,* D.C.App., 393 A.2d 71, 93 (1978).

2. The Commission's order mentions evidence not present in the record. We expect that this oversight will not be repeated when new findings and conclusions are made on remand. *See* D.C.Code 1978 Supp., § 1–1509(c):

   The testimony and exhibits, together with all papers and requests filed in the proceeding, and all material facts not appearing in the evidence but with respect to which official notice is taken, shall constitute the *exclusive* record for order or decision. No sanction shall be imposed . . . except upon consideration of such *exclusive* record . . . . [Emphasis added.]

   See *In re Dwyer,* D.C.App., 399 A.2d 1 (1979); *Citizens Ass'n of Georgetown v. D.C. Alcoholic Beverage Control Bd.,* D.C.App., 288 A.2d 666, 669 (1972).

3. D.C.Code 1978 Supp., § 1–1509(e) provides:
   Every decision and order adverse to a party to the case, rendered by the Mayor or an agency in a contested case, shall be in writing and shall be accompanied by findings of fact and conclusions of law. The findings of fact shall consist of a concise statement of the conclusions upon each contested issue of fact. Findings of fact and conclusions of law shall be supported by and in accordance with the reliable, probative, and substantial evidence. A copy of the decision and order and accompanying findings and conclusions shall be given by the Mayor or the agency, as the case may be, to each party or to his attorney of record.

does not excuse the Commission from its duty of making a finding as the result of its consideration of that evidence." *Miller v. District of Columbia Commission on Human Rights,* D.C.App., 339 A.2d 715, 720 (1975), quoting *Saginaw Broadcasting Co. v. Federal Communications Commission,* 68 App. D.C. 282, 291, 96 F.2d 554, 563, *cert. denied sub nom. Gross v. Saginaw Broadcasting Co.,* 305 U.S. 613, 59 L.Ed.2d 72, 83 L.Ed. 391 (1938).

## I

Dr. Robert J. Sherman, a physician, was licensed by the Commission to practice medicine in the District of Columbia on July 15, 1957. Dr. Sherman's practice was largely as a government physician until 1973, when he retired on a total disability pension. From 1973 until March 31, 1976, he concentrated on his private medical practice, particularly on the operation of a small out-patient clinic where he performed between six and twenty-five abortions each day. On June 7, 1976, the Commission gave Dr. Sherman formal notice of a proceeding to revoke his medical license, based on a charge of professional misconduct supported by six specifications.[4]

Between August 19, 1976 and April 18, 1977, the Commission heard fourteen days of testimony on the revocation charges. The government called ten witnesses (including Dr. Sherman as an adverse witness). The petitioner called thirty-six witnesses. In a decision issued on September 7, 1977, the Commission found three of the specifications to be fully proven; a fourth specification was proven in part.[5] Its decision informed Dr. Sherman that

1. On or about March 4, 1975, you did willfully and without any valid medical basis perform a septic and incomplete abortion on your patient, Rita C. McDowell, in order to require her to undergo subsequent surgical procedures at an additional fee, and that said septic and incomplete abortion did result in the death of said Rita C. McDowell.

2. You did willfully fail to use medically proper sterilization techniques in the performance of abortions by (1) reusing unsterilized disposable cannulae not meant for reuse, (2) using unsterilized tenaculums, sounds and forceps.

3. You did cause, suffer and allow your employee, Helen Overstreet, a person not licensed as a physician or registered as a nurse, to perform cryosurgery on your patients.

4. You did perform unnecessary services to increase your fees to patients by:

  a. intentionally and willfully failing to complete suction aspiration abortions in order to require patients to return for additional surgical procedures, and

  b. causing, suffering, and allowing Helen Overstreet to perform cryosurgery on medicaid beneficiaries without regard to actual medical need.

The Commission revoked Dr. Sherman's license to practice medicine in the District of Columbia. This petition for review asks us, pursuant to D.C.Code 1978 Supp., § 1–1510, to reverse or remand the Commission's order.[6]

---

4. The Commission was acting pursuant to D.C. Code 1973, § 2–123. Extensive amendments to this section became effective on May 6, 1977. *See* D.C.Code 1978 Supp., § 2–123. These amendments should provide much guidance for the Commission if it decides to reopen the record in this case.

5. The Commission found that the evidence was insufficient to sustain the fifth and sixth charged specifications, as well as much of the fourth. These had alleged that Dr. Sherman sought extra money by requiring unnecessary internal examinations of all female patients, and by issuing unnecessarily short prescriptions for birth control pills, that he willfully failed to adequately test and store specimens for laboratory analysis, and that he willfully defrauded the District of Columbia by double billing for Medicaid services.

6. We can take judicial notice of the fact that Dr. Sherman pleaded guilty to several counts of perjury involving testimony in the hearings on his license revocation and that has been sentenced to a term in prison for those offenses. *United States v. Sherman,* Crim.No. 1969–78 (D.C.Super.Ct. July 10, 1979). While the Commission may wish to consider those facts in weighing Dr. Sherman's testimony on remand,

## II

Dr. Sherman's petition for review alleges several specific failures on the Commission's part, the first of which, undue reliance on privately promulgated guidelines, coupled with our own concern about the Commission's lack of clarity in its legal conclusions, requires remand. We nevertheless consider other allegations advanced by petitioner, since the Commission will face them on remand and since they are relevant to our decision to order neither a reversal nor a mandatory reopening of the record in this case.

■ We begin by dismissing the contention that the Commission erred in admitting into evidence and in relying upon Dr. Sherman's "concession of negligence" in the death of Rita McDowell. This concession was made in *McDowell v. Sherman,* Civil Action No. 5783–75 (D.C.Super.Ct.), a civil malpractice action brought by Miss McDowell's family, based on the same facts as those of the first specification found here by the Commission. Petitioner seeks to rescind that concession; one that was originally made in writing by petitioner's attorney, was orally affirmed by petitioner in conference with the trial judge, and was submitted to the civil jury without objection. The malpractice trial judge denied a later motion to withdraw the concession and an affidavit was filed by then counsel denying that Dr. Sherman had expressed any reluctance to sign the statement of concession. Ample evidence thus exists to support the Commission's finding that the concession of negligence was voluntarily made.

■ The claim that the Commission in those proceedings erroneously placed the burden of proof on petitioner is also without merit. Petitioner relies on the fact that the Commission Chairman opened the hearing by telling Dr. Sherman that "[t]he Commission believes that it has sufficient evidence which, if not rebutted or explained, [would] justify the Commission's taking [Dr. Sherman's license.]" His argument confuses the burden of persuasion with the burden of proceeding, however. The Commission may proceed to a hearing only if it is satisfied that a prima facie case has been made. 5DD DCRR § 20.2(b). This rule is intended to protect licensees from mandatory hearings based on unfounded charges. The June 17 formal notice of charges warned Dr. Sherman that this preliminary threshold had been cleared and the Commission Chairman quite properly reminded him of that fact at the outset of the hearing. The burden of ultimate persuasion, by contrast, rested on the Commission. D.C.Code 1978 Supp., § 1–1509(b), 5DD DCRR § 40.-7(b). The members of the Commission, in response to questions by petitioner's counsel, stated at the very beginning of the hearings that they had not prejudged this case. Their final decision rejected, as unsustained by proof, several specifications of misconduct for which at least a prima facie showing of evidence had been made. There is no evidence that the Commission fell victim to the confusion that petitioner now urges upon us.

■ Nor are we disturbed by the allegation that the Commission misunderstood or misapplied the "wilful misconduct" standard of care to which Dr. Sherman was held.[7] It is true, as petitioner alleges, that willfulness means "something worse than good intentions coupled with bad judgment." *Mullen v. United States,* 105 U.S.

they are not relevant to the errors of factual findings and legal conclusions which we now review.

7. In this connection we note that the amended statute, D.C.Code 1978 Supp., § 2–123(d), now defines professional misconduct as, among other things:

> (14) Demonstrating a wilful *or careless* disregard for the health, welfare or safety of a patient . . . . [Emphasis added.]

We need not now consider the "or careless" provision of the statute since the June 17 formal notice to Dr. Sherman specifically charged him with "wilfully" practicing improper abortion procedures. The Commission could not find him guilty of "carelessness" without new notice and a chance to respond to that new charge.

App.D.C. 25, 26, 263 F.2d 275, 276 (1958). And it is true, as petitioner also alleges, that the Commission's decision at one point equated "gross carelessness" with "gross negligence." [Decision at 36.] But the Commission, in its final conclusions of law specifically held Dr. Sherman guilty of willful misconduct. And this court has said:

> Willfulness does not necessarily require an intent to do harm; but it does require a conscious indifference to consequences under circumstances likely to cause harm. [*Bohannon v. District of Columbia Department of Motor Vehicles,* D.C.App., 288 A.2d 672, 675 (1972).]

■ The Commission's decision reflects a proper understanding of this standard when it concludes as a matter of law that

> Respondent's use of a 7 mm. cannula to evacuate a 12-week fetus (as he diagnosed it) was voluntary on his part. This constitutes willful design to perform an incomplete abortion. Respondent knew, or should have known, based on his performance of numerous prior abortions, that the 7 mm. cannula would negate a complete abortion. . . . [Decision at 30.]

There was ample evidence in the findings of fact to support this conclusion of law. We are, thus, not persuaded that the Commission erred in its understanding or application of the standard of conduct required of Dr. Sherman.

Petitioner next contends that his medical license should be revoked only upon a showing of "clear, unequivocal, and convincing evidence . . .," *Woodby v. I. N. S.,* 385 U.S. 276, 286, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966), and not by the traditional standard for administrative proceedings applied by the Board in this case—a preponderance of the evidence. This claim has no statutory basis [8] and is essentially grounded in a Fifth Amendment claim that due process requires this higher degree of proof.

Petitioner cites three Supreme Court cases to support this argument. The first, *In re Ruffalo,* 390 U.S. 544, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968), holds that disbarment of an attorney is a "quasi-criminal" proceeding requiring procedural due process, including fair prior notice of the charge. *Id.* at 550–51, 88 S.Ct. 1222. The second case, *Woodby v. I. N. S., supra,* holds that involuntary deportation proceedings have such serious consequences as to require a higher standard of proof than preponderance of the evidence. Finally, petitioner relies upon *Addington v. Texas,* 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979), holding that involuntary and indefinite civil commitments for mental illness do not require proof beyond reasonable doubt, but do require proof greater than the preponderance of the evidence standard applicable to other categories of civil cases.

Insofar as *In re Ruffalo* holds that bar membership is such a property interest as will trigger due process protection, we accept petitioner's analogy to his medical license; it can be revoked only with due process. The question before us is, what process is due? In particular, is the higher standard of proof an essential part of due process? *In re Ruffalo,* rejecting a mid-hearing amendment of charges against an attorney, offers us no guidance on our specific question of constitutionally required standards of proof.[9]

■ Determination of constitutionally required due process for a particular situation is essentially a balancing test involving consideration of governmental interests in efficiency and accurate determinations, private concerns at stake in the case, the complexi-

---

8. Indeed the implication of the statutes was that preponderance of the evidence was the proper standard of proof. *See* D.C.Code 1973, § 2–123 (placing discretion in the Commission, subject to the DCAPA), § 1–1509(b) (putting undefined "burden" on moving party), 5DD DCRR § 20.2(b) (same), § 1–1510 (limiting this court's evidentiary review to the "substantial evidence test").

9. Since petitioner has chosen to analogize his position to that of an attorney facing disbarment, we note in passing that the rules and statutes of this jurisdiction appear to allow an attorney's disbarment to be based on a preponderance of the evidence. *In re Dwyer, supra* at 11; D.C.App.R. XI, §§ 4(3)(c), 7(2), 7(3).

ty of the issues, the nature of the proceedings and its other safeguards, and an assessment of the danger to society from inaccurate determinations in each direction. *Arnett v. Kennedy,* 416 U.S. 134, 164, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974) (concurring opinion of Mr. Justice Powell); *Boddie v. Connecticut,* 401 U.S. 371, 378, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971); *Cafeteria & Restaurant Workers Union v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961); H. Friendly, J., *Some Kind of Hearing,* 123 U.Pa.L.Rev. 1267, 1278 (1975). In applying this test in *Addington* and *Woodby,* the Supreme Court was strongly influenced by the drastic consequences—confinement and deportation—at stake in those cases, as well as by society's ability to live with the consequences of a decision favoring the individual. In *Addington, supra* at 99 S.Ct. 1809–10, the Court repeatedly referred to the specific *liberty* interest at stake there and to the danger that an isolated idiosyncratic act could be "within a range of conduct that is generally acceptable." *Id.* In *Woodby, supra* 385 U.S. at 285, 87 S.Ct. at 487–488, the Court clearly expressed its concern for "family, social and economic ties" exposed to "the drastic deprivations that may follow when a resident of this country is compelled by our Government to forsake all bonds formed here to go to a foreign land where he often has no contemporary identification." Neither of these cases is equivalent to that of petitioner.

■ It is true, of course, that the revocation of a medical license is a serious matter to the holder of that license. Petitioner asserts that "[a] physician's individual interest in retaining his license to practice his profession is surely as strong as the individual interest at stake in *Addington.*" [Pet. Supp.Memo. of 7/30/79, at 3.] This is surely wrong. License revocation affects a property interest that is in no sense as serious as the liberty interests implicated in confinement or deportation. Practicing medicine is a privilege earned by continued

compliance with professional standards of expertise. The revocation of a medical license is a "remedial measure for the protection of the public, and not a penalty or forfeiture." *Kemp v. Board of Medical Supervisors,* 46 App.D.C. 173, 180 (1917). The public's need for that protection is amply illustrated by the facts of this case. Furthermore, the provisions of the DCAPA provide a wide range of safeguards for the public and for physicians against erroneous license revocations. Finally, the medical licensure statute allows a mixture of expert and lay consideration of issues that may be technically complex.

■ Against this background the importance of a medical license to Dr. Sherman cannot require that the Commission apply the high persuasive standard of "clear and convincing evidence." Even in welfare cases where "the very means by which to live" are at stake, the Supreme Court has not considered such a stricter standard of proof to be an essential element of due process. *Goldberg v. Kelly,* 397 U.S. 254, 266–71, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). In describing the elements of a required hearing, the Court there specifically stated that, despite the fact that "essential food, clothing, housing, and medical care" were at stake, "due process does not require a particular order of proof." *Id.* at 264, 269. In short, we hold that the preponderance of the evidence test adequately protected Dr. Sherman's Fifth Amendment property interest in his license.

### III

■ The Commission, over objection, received into evidence the guidelines for the operation of out-patient abortion clinics which were drawn up by the District of Columbia Medical Society and by Planned Parenthood, Inc. These guidelines were admitted as evidence of "prevailing community standards" against which Dr. Sherman's practice could be measured.[10] The Commis-

10. Even on this basis it appears that there was insufficient foundation for a belief that the guidelines were "reliable, probative and sub-

stantial evidence" of community standards. D.C.Code 1978 Supp., § 1–1509(e). While Dr. Sherman testified that he was aware of, and

sion's conclusions of law, however, repeatedly relied upon noncompliance with the guidelines as per se evidence of malpractice. At one point, for example, the Commission held that, "[i]n the absence of the full complement of staff called for by the local guidelines, it is inescapable that respondent's clinic could not and did not function in a sterile way."

■ The guidelines admitted at the hearing had not been adopted or promulgated by either the Commission or by the Council of the District of Columbia. To rely upon their violation as per se evidence of Dr. Sherman's responsibility for Rita McDowell's death, or of his failure to use proper sterilization techniques, was to treat the guidelines of a private group of professionals as having the force of public law.

It matters little whether we consider this reliance as a violation of the DCAPA requirement that rules and regulations must be promulgated before being applied, D.C. Code 1978 Supp., § 1–1506(c), as a violation of Dr. Sherman's right to prior notice of criteria to be applied at the hearing, *Palace Restaurant, Inc. v. Alcoholic Beverage Control Board*, D.C.App., 271 A.2d 561 (1970), or as an improper delegation of public power to a private group. What is clear is that this is exactly the procedural shortcut that we held to be error in *Lewis v. District of Columbia Commission on Licensure to Practice the Healing Art*, D.C.App., 385 A.2d 1148 (1978). In *Lewis,* we held that the practice of acupuncture was not grounds for license revocation solely on the grounds that it violated the guidelines of the Medical Society. The Commission's conclusions of law suggest that it repeated that error here.

Petitioner claims that the Commission's improper reliance on the Medical Society's guidelines tainted the Commission's entire decision. Respondent argues that the error was essentially harmless since the guidelines were merely cumulative and there was ample independent evidence to support the Commission's ultimate conclusion.

■ To decide the issue of harmless error we have, on one side, the clear statutory authorization of D.C.Code 1978 Supp., § 1–1510: "The court may [in administrative proceedings] invoke the rule of prejudicial error." This codifies a policy of widely recognized common sense: remand is not required "when a mistake of the administrative body is one that clearly had no bearing on the procedure used or the substance of decision reached." *Massachusetts Trustees of Eastern Gas & Fuel Associates v. United States*, 377 U.S. 235, 248, 84 S.Ct. 1236, 1245, 12 L.Ed.2d 268 (1964). In terms relevant to this case, "the possibility of prejudice from the admission of incompetent evidence may be dispelled by showing that the matter involved was not relied on." *Braniff Airways, Inc. v. C. A. B.*, 126 U.S. App.D.C. 399, 412, 379 F.2d 453, 466 (1967).

The contrary policy is grounded in the importance of requiring that agencies be responsible for the exercise of the discretionary power they are given. This makes it necessary that the rationales actually offered by an agency should justify the decisions that it reaches. *Dietrich v. District of Columbia Board of Zoning Adjustment,* D.C.App., 293 A.2d 470 (1972). The conflicting requirements of judicial deference and judicial review make this especially important. The classic recognition of this is that "the orderly functioning of the process of review requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained." *SEC v. Chenery Corp.,* 318 U.S. 80, 94, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943). And so we examine the role of the guidelines with these principles in mind. *Cf. Citizens Association of Georgetown v. District of Columbia Board of Zoning Adjustment,* D.C.App., 403 A.2d 737, 741–42 (1979).

■ In our examination it is relevant that the Commission repeatedly uses language that suggests a logical syllogism: *if* Dr. Sherman did not comply with the guidelines, *then* he was not operating in a sterile

---

complied with, the standards, there was frank and repeated testimony by doctors (testifying

for the government) that their practices were not in full compliance with the guidelines.

fashion; *if* the doctor had no professional counseling staff, *then* patients were not able to give informed consent. This reliance on noncompliance as per se evidence of malpractice indicates the significant role of the guidelines and suggests another reason why reliance on them may not have been harmless.

Dr. Sherman was charged with "misconduct" under D.C.Code 1973, § 2–123, before its recent amendments. This court has already commented on the vague nature of that standard. *Lewis v. District of Columbia Commission on Licensure to Practice the Healing Art, supra* at 1152–53. The present charges against Dr. Sherman fall within the holding of *Ladrey v. Commission on Licensure to Practice the Healing Art in the District of Columbia,* 104 U.S.App.D.C. 239, 261 F.2d 68, *cert. denied,* 358 U.S. 920, 79 S.Ct. 288, 3 L.Ed.2d 239 (1958), that certain actions so clearly constitute misconduct as to avoid constitutional problems of statutory fair notice. Yet the vagueness of the old § 2–123 does make it necessary that our review of the Commission's decision be especially stringent in order to ensure that its findings were not based on anything other than the charges for conduct so clearly improper as to give Dr. Sherman fair notice that it was legal misconduct.

Finally, we are influenced by the confused nature of some of the Commission's decision. The conclusions of law stated by the Commission, while extensive, do not clearly indicate just how the Commission moved from its findings to its ultimate conclusions about the proven specifications. After carefully reviewing them, we cannot say with any certainty that the Commission did not rely significantly on Dr. Sherman's noncompliance with the private guidelines. ▮ In reaching this conclusion, we do not hold that the Commission's findings of professional misconduct are necessarily erroneous. They are certainly supported by independent evidence. The Commission relied on a number of factors which might well sustain its conclusion. Nevertheless, it is not absolutely clear that the same conclusion would have been reached if the Commission had not relied on the erroneously admitted evidence. Moreover, since determinations of professional misconduct and, especially, of the appropriate penalties for such misconduct, are a matter committed to the discretion of the Commission, this court is not at liberty to say that the Commission's conclusion would not have been affected by the elimination of reliance on the guidelines. *SEC v. Chenery Corp., supra; Miller v. District of Columbia Commission on Human Rights, supra.*

Accordingly, we remand this case for a specific determination by the Commission as to whether its conclusions regarding Dr. Sherman's conduct will stand, absent consideration of the guidelines.

*So ordered.*