# District of Columbia
# Court of Appeals

**No. 14-AA-830**

ACOTT VENTURES, LLC T/A SHADOW ROOM,
                              Petitioner,

      v.

DISTRICT OF COLUMBIA ALCOHOLIC BEVERAGE CONTROL BOARD,
                              Respondent,

    and                                  **PRO-149-13**

CHRIS LABAS, FLORENCE HARMON, MICHAEL MACCHIAROLI, TREVOR NEVE, DEBORAH NEVE, BETTY DOW and BARBARA SEARLE,
                              Intervenors.

On Petition for Review of an Order
of the District of Columbia Office of Administrative Hearings



BEFORE: THOMPSON and EASTERLY, *Associate Judges*; and KRAVITZ, *Associate Judge, Superior Court of the District of Columbia*[*].

## J U D G M E N T

This case came to be heard on the administrative record, a certified copy of the agency hearing transcript and the briefs filed, and was argued by counsel. On consideration whereof, and as set forth in the opinion filed this date, it is now hereby

ORDERED and ADJUDGED that the decision of the Alcoholic Beverage Control Board is affirmed.

For the Court:

*Julio A. Castillo*

JULIO A. CASTILLO
Clerk of the Court

Dated: March 17, 2016.

Opinion by Associate Judge Neal E. Kravitz.

---

[*] Sitting by designation pursuant to D.C. Code § 11-707 (a) (2012 Repl.).

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

FILED 3/17/16
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

No. 14-AA-830

ACOTT VENTURES, LLC T/A SHADOW ROOM, PETITIONER,

v.

DISTRICT OF COLUMBIA ALCOHOLIC BEVERAGE CONTROL BOARD, RESPONDENT,

and

CHRIS LABAS, FLORENCE HARMON, MICHAEL MACCHIAROLI, TREVOR NEVE, DEBORAH NEVE, BETTY DOW, AND BARBARA SEARLE, INTERVENORS.

On Petition for Review of a Decision and Order
of the District of Columbia Alcoholic Beverage Control Board
(PRO-149-13)

(Argued January 19, 2016                          Decided March 17, 2016)

*Matthew August LeFande* for the petitioner.

*Karl A. Racine*, Attorney General for the District of Columbia, *Todd S. Kim*, Solicitor General, *Loren L. AliKhan*, Deputy Solicitor General, and *Richard S. Love*, Senior Assistant Attorney General, filed a statement in lieu of a brief in support of the respondent.

*Cornish F. Hitchcock* for the intervenors.

Before THOMPSON and EASTERLY, *Associate Judges*, and KRAVITZ, *Associate Judge, Superior Court of the District of Columbia.*[*]

---

[*] Sitting by designation pursuant to D.C. Code § 11-707 (a) (2012 Repl.).

KRAVITZ, *Associate Judge*: The Shadow Room nightclub challenges a decision of the District of Columbia Alcoholic Beverage Control Board requiring the club to retain a reimbursable Metropolitan Police Department detail as a condition of the renewal of its liquor license. Shadow Room contends that the Board misallocated the burden of proof and erroneously admitted hearsay and unqualified expert testimony at a contested hearing on its application for the renewal of its license. Shadow Room contends further that the Board lacked legal authority to condition the renewal of its license on its hiring of a police detail and that the Board's decision was not supported by substantial evidence in the record. Finally, Shadow Room argues that the Board's decision must be set aside because the neighbors and representatives of the local Advisory Neighborhood Commission who protested its application acted with an unlawful discriminatory motive. We reject the club's contentions and affirm the decision of the Board.

## I. FACTUAL AND PROCEDURAL HISTORY

### A. Background

Shadow Room is owned and operated by the petitioner, Acott Ventures, LLC. The club is located on the ground floor of a commercial building at 2131 K

Street, N.W., in a mixed downtown neighborhood along with other commercial establishments, office buildings, hotels, apartments, condominiums, and a hospital. The main campus of George Washington University is a few blocks away.

This appeal is the latest installment of a decade-long dispute between Shadow Room's owners and neighbors over the impact of the club's operations on the area surrounding the club. The dispute began in 2006, when Shadow Room first sought a liquor license from the Alcoholic Beverage Control Board. The club's application drew protests from a "group of five or more" neighbors residing in the West End Place condominiums, at 1099 22nd Street, N.W., and from ANC 2A, the local Advisory Neighborhood Commission. *See* D.C. Code §§ 25-601 (2) & (4) (2012 Repl.).

The Board granted Shadow Room's application despite the protests and issued the club a Retail Class C/N liquor license in September 2007. *See* D.C. Code § 25-113 (d)(2)(A) (2012 Repl.). To address concerns about unruly patrons making noise late at night, the Board set limits on the club's hours of operation and maximum number of customers. By law, the club's license was valid for three years, subject to renewal via application to the Board. *See* D.C. Code § 25-104 (b) (2012 Repl.).

Shadow Room opened for business shortly after it obtained its license. A year later, in September 2008, the club applied to the Board for an extension of its hours of operation and a doubling of its capacity, from 300 to 600 customers. ANC 2A protested the application. Before the matter proceeded to a hearing, however, Shadow Room and ANC 2A reached a settlement agreement under which the club's hours were extended but its occupancy cap was maintained at 300; the club also promised to monitor the exterior of the premises and the conduct of its incoming and outgoing customers. *See* D.C. Code §§ 25-445, -446 (2012 Repl.). The Board issued an order on November 12, 2008 approving the terms of the settlement agreement. *See* 23 DCMR § 1608.2 (2008).

In 2009, the owners of Acott Ventures, LLC formed a separate limited liability company, Panutat, LLC, and through that entity applied to the Board for a Retail Class C/N liquor license for a nightclub named Sanctuary 21 to be housed in the basement of Shadow Room's building. A "group of five or more" neighbors and ANC 2A protested the application, arguing that the application was intended as an end-run around the occupancy cap set forth in the settlement agreement between Acott Ventures, LLC and ANC 2A. The parties protesting the application also contended that the presence of a second nightclub at the same address as Shadow

Room would adversely affect pedestrian safety, real property values, and the peace, order, and quiet of the neighborhood.

After two contested hearings and an interim trip to this court, the Board issued an order on January 11, 2012 denying the application of Panutat, LLC for a liquor license to open a nightclub in the basement of 2131 K Street, N.W. The Board concluded that it was not appropriate to approve a license for a second nightclub to operate directly beneath Shadow Room because the two clubs together would be able to circumvent the occupancy cap set forth in the settlement agreement, to the detriment of nearby residents. We affirmed the Board's denial of Panutat, LLC's application. *Panutat, LLC v. District of Columbia Alcoholic Beverage Control Bd.*, 75 A.3d 269, 272 (D.C. 2013).

In the meantime, Shadow Room submitted an application to the Board in 2010 seeking the renewal of its license for a second three-year period, as well as permission to open a summer garden on the sidewalk in front of the club. A "group of five or more" neighbors and ANC 2A protested the application, and the Board held a contested hearing. In an order issued on January 11, 2012, the Board granted Shadow Room's request for the renewal of its liquor license on the conditions that the club not distribute flyers to its patrons on the premises and that

it keep the front and immediate vicinity of the establishment free of debris and litter. The Board denied Shadow Room's request for a summer garden, concluding that the outdoor lounge envisioned by the club would lead to an increase in the number of disturbances in the neighborhood caused by the club's customers.

In the matter now before us, Shadow Room applied to the Board in 2013 for yet another renewal of its liquor license. At the time, the club was open for business three nights each week: Thursdays from 10:00 p.m. until 2:00 a.m. and Fridays and Saturdays from 10:00 p.m. until 3:00 a.m. Featured music at the club was hip-hop on Thursday nights, a mix on Fridays, and "house with a little bit of hip-hop" on Saturday nights. The club advertised its Thursday night offerings as "Instant Chaos."

A "group of five or more" neighbors and ANC 2A again opposed Shadow Room's application for renewal. Stating that they were most concerned about loud and unruly behavior in the streets around the club after closing time on Thursday nights, the protestants argued for the denial of Shadow Room's application or, in the alternative, for an order requiring the club to hire a reimbursable Metropolitan Police Department detail as a condition of the renewal of its license.

**B. The Protest Hearing**

The Alcoholic Beverage Control Board, with all seven of its members present, convened an evidentiary hearing on Shadow Room's renewal application on March 12, 2014. The first witness, called by the Board, was John Suero, an investigator with the Alcoholic Beverage Regulation Administration (ABRA) assigned to investigate the appropriateness of the club's request. Mr. Suero testified that he and other ABRA investigators made a total of seventeen documented visits to the club at varying times of night in February 2014. Mr. Suero gave a favorable report, stating that on his visits he heard no noise in the alley behind the club and observed no loitering, fighting, or police activity out front. Mr. Suero stated further that he did not see an excessive number of cars parked on the street outside the club and that the trash receptacle and alley behind the club were well maintained. He conceded that none of the visits by ABRA investigators occurred at closing time on a Thursday night and that only one visit occurred at closing time on a Friday or Saturday night. He also stated that the investigation was conducted during an unusually cold period and that the weather might have had a chilling effect on the behavior of Shadow Room's customers leaving the club.

Shadow Room then called Swaptak Das, an owner and manager of the club, as its only witness. Mr. Das testified that Shadow Room employs a team of eleven or twelve people to handle security inside and outside the club every night the club is open. He testified further that the club has taken significant steps to ensure the quiet and orderly departure of its customers. Specifically, Mr. Das stated that the disc jockey makes an announcement every night at closing time asking customers to be quiet as they leave the club, that signage and security personnel reinforce this message as patrons depart, and that customers waiting for their cars at a valet parking kiosk in front of the club are required to line up in the direction of 21st Street, N.W. (and away from the nearest residences, located on 22nd Street, N.W.). In addition, Mr. Das stated, all visitors on Thursday nights are patted down for weapons as they enter the club, and the club brings in an expert from California to conduct monthly security trainings for its staff.

Regarding security outside the club, particularly at closing time, Mr. Das testified that the club's security staff is permitted to go all the way up and down the 2100 block of K Street, N.W., as necessary to ask customers to be quiet and orderly as they leave the club and move on to their next destinations. Mr. Das acknowledged, however, that the club's security personnel are not allowed to intervene in altercations occurring outside the club except within a seven-foot-by-

seven-foot-square area directly in front of the club's entrance; in the event of an altercation involving a Shadow Room customer occurring beyond this designated area, the club's security staff is prohibited from doing anything other than notifying management and calling 911.

Mr. Das nonetheless denied that Shadow Room's customers are frequently loud and unruly as they leave the club at closing time. To the contrary, he testified, the club's patrons are mostly educated, well-dressed professionals who travel to and from the club by taxi and cause no trouble in the neighborhood. Mr. Das assured the Board that the club's security team is able to handle the crowd and that a police detail would be not only prohibitively expensive, but unnecessary.

The first witness for the protestants was Derek Crumbley, a licensed private investigator with twenty-one years of experience. Mr. Crumbley explained that he was retained by the homeowners' association at West End Place, 1099 22nd Street, N.W. His task was to monitor Shadow Room's front entrance from 10:00 on a Thursday night until 3:00 the following morning.

Mr. Crumbley testified that he positioned himself inside a car parked in the service lane of the 2100 block of K Street, N.W. beginning at 10:00 p.m. on

Thursday, March 6, 2014. Mr. Crumbley watched from a distance of thirty to thirty-five feet as 150 to 200 people entered the club over the next several hours and "a large mob" then exited the club shortly after 2:00 a.m. and began a loud pushing and shoving match on the sidewalk. The pushing and shoving quickly escalated into fisticuffs involving three or four people, one of whom was struck in the back of the head before the altercation spilled out into the street directly in front of the club. At some point, security personnel from the club restrained one of the men involved in the fight but then released him, enabling the man to return to the fight, which continued for three or four minutes before everyone was separated. The police arrived fifteen or twenty minutes later, after the fight had ended and the people involved had dispersed and left the area. Mr. Crumbley videotaped the incident from inside his car, and his video was admitted in evidence and played for the Board.

Over Shadow Room's objection, Mr. Crumbley testified that a police detail stationed outside the club would have led to the handling of the fight in a more timely manner and would have prevented the incident from escalating as it did. Mr. Crumbley later acknowledged on cross-examination that he had no training or experience in law enforcement or nightclub security.

The next witness for the protestants was Lieutenant Donald Craig, a twenty-four-year veteran of the Metropolitan Police Department assigned to the police district in which Shadow Room is located. Lt. Craig testified that he had compiled police reports and 911 call records for incidents involving the club's customers from 2009 through 2013. He then walked the Board through the reports of several of the incidents, including an assault with a dangerous weapon (brandy glass) that occurred inside the club in 2013 and a fight among thirty of the club's patrons in 2011. In all, seventy pages of police incident reports and 911 call records were admitted in evidence and made a part of the hearing record.

Lt. Craig also testified that Shadow Room has been a frequent topic of discussion at community and Advisory Neighborhood Commission meetings he has attended. He reported that Shadow Room's neighbors have complained repeatedly at those meetings about noisy and disorderly behavior by the club's patrons after closing time on Thursday, Friday, and Saturday nights.

Asked whether he thought a police detail would be helpful, Lt. Craig stated that a detail would greatly diminish the amount of noise and unruly behavior outside the club. Lt. Craig explained that a dedicated police presence would deter boisterous and violent conduct by departing patrons and facilitate the prompt

arrival of additional police resources whenever an incident occurred. He stated that a police detail would make everyone in the area safer and have a decidedly positive impact on the quality of life of the nearby residents on 22nd Street, N.W.

The protestants then presented the testimony of three residents of West End Place regarding late-night incidents involving people believed to be Shadow Room customers. The first resident to testify, Steve Mendelbaum, explained that the condominium building is located in the same block as Shadow Room, across an alley running behind the club. Mr. Mendelbaum stated that his bedroom is in the rear of the condominium building, facing the alley and Shadow Room's rear door. On three occasions in the eleven months he has lived in the building, he testified, loud dance music and people screaming in the alley after midnight on Thursday and Friday nights have awakened him or kept him from falling asleep. He called the police during two or three of the incidents, and each time the noise continued until a police cruiser drove through the alley.

Trevor Neve, the president of the West End Place homeowners' association, testified that he has lived in the condominium building for twenty-one years. He stated that his unit is in the front of the building, facing 22nd Street, N.W., and that from his window he is able to see the entire block of 22nd Street, stretching from K

Street to L Street. He stated that he has observed several incidents on Thursday nights between 2:00 and 3:00 a.m. involving people he believes had just left Shadow Room and walked around the corner onto 22nd Street, perhaps toward their cars. Each incident, he testified, involved loud laughing, yelling, or other noisy behavior, including one episode in which he observed a young woman "spread over the hood of a car" at 2:30 in the morning and "laughing uproariously with the driver." On another occasion, he stated, he saw a man and a woman engaged in a loud argument for several minutes over the man's alleged flirtatious conduct toward other women that night.

Chris Labas lives on site and serves as the property manager for the West End Place condominiums. He testified that on July 5, 2013, at a little after 2:30 a.m., he watched from his window facing 22nd Street, N.W. as a group of people turned right from the 2100 block of K Street onto 22nd Street and walked toward his building. The people were yelling and screaming, and he recognized one of them as a woman he had seen earlier that night park her car and walk over and stand in the line for admission to Shadow Room. Mr. Labas stated that he went out onto his balcony and used his smartphone to videotape the people as they walked up 22nd Street past his building. The video, played for the Board at the hearing, showed the group yelling and scuffling on the sidewalk. Mr. Labas testified that

the video presented a scene that repeats itself on his block two or three times each month on Thursday nights shortly after Shadow Room's closing time.

Mr. Neve and Mr. Labas also testified about several additional incidents they have heard about in their roles as homeowners' association president and property manager at West End Place. Mr. Neve stated that many West End Place residents have complained at association board meetings about noise and unruly behavior involving Shadow Room patrons and have expressed concern about the safety of the neighborhood at the club's closing time. Mr. Labas stated that he has fielded a large number of complaints from other residents about incidents at closing time on Thursday nights in which people believed to be Shadow Room customers were seen urinating and defecating in public, engaging in sexual activity on the hood of a parked vehicle, racing cars on K and 22nd Streets, and yelling, screaming, and fighting.

Florence Harmon, the ANC 2A Commissioner, was the protestants' final witness. Ms. Harmon testified that Shadow Room has violated the settlement agreement approved by the Board on November 12, 2008 by failing to monitor the exterior of the premises and the conduct of its incoming and outgoing customers.

**C. The Board's Decision**

The Board issued written findings of fact and conclusions of law on July 16, 2014. The Board found that Shadow Room's operations were not having an adverse effect on residential parking or property values in the area. However, the Board credited the testimony of the protestants' witnesses and found that Shadow Room's customers frequently yell, scream, and engage in fighting and other disruptive behavior outside the club and in the surrounding area. Based on this finding, the Board determined that Shadow Room's operations were having a negative impact on the peace, order, and quiet of the neighborhood and on vehicular and pedestrian safety, all to the detriment of the protestants and other neighbors of the club.

The Board considered whether Shadow Room's renewal application should be denied outright and its liquor license revoked. The Board concluded, however, that a mandatory reimbursable Metropolitan Police Department detail would deter and control the unruly behavior of Shadow Room's patrons and effectively contain the club's adverse impact on the surrounding neighborhood and its residents. The Board accordingly granted Shadow Room's request for the renewal of its liquor license but conditioned the renewal on the club's retention of a reimbursable police

detail for at least four hours every night the club is in operation, including at least one hour after the club closes. The vote to require a police detail as a condition of the renewal of Shadow Room's license was 7-0, with one member of the Board writing separately to state that she would require a detail only on Thursday nights.

Shadow Room brought this timely petition for judicial review to challenge the Board's imposition of a mandatory reimbursable police detail as a condition of the renewal of its license. The protestants before the Board intervened in this court in support of the Board's decision.

## II. ANALYSIS

### A. Standard of Judicial Review

We undertake only limited review of an administrative agency's decision, affirming unless we conclude that the decision was either unsupported by substantial evidence in the record or arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *Panutat, LLC*, 75 A.3d at 272; *see generally* D.C. Code § 2-510 (a) (2012 Repl.). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,"

*Children's Defense Fund v. District of Columbia Dep't of Emp't Servs.*, 726 A.2d 1242, 1247 (D.C. 1999), a standard satisfied "with a minimal amount of evidence, given our deference to the [agency's] informed judgment and special competence in the matters before it," *Le Jimmy, Inc. v. District of Columbia Alcoholic Beverage Control Bd.*, 433 A.2d 1090, 1093 (D.C. 1981). Moreover, as long as an agency's decision is properly supported by substantial evidence in the record, we will not substitute our own judgment for that of the agency "even though there may also be substantial evidence to support a contrary decision." *Aziken v. District of Columbia Alcoholic Beverage Control Bd.*, 29 A.3d 965, 972 (D.C. 2011) (citation omitted). We nonetheless remain the final authority on all questions of law, although we show deference to an agency's interpretation of its own regulations and the statutes it administers unless the agency's interpretation is plainly wrong or inconsistent with the governing regulatory and statutory scheme. *Recio v. District of Columbia Alcoholic Beverage Control Bd.*, 75 A.3d 134, 141 (D.C. 2013).

**B. Burden of Proof**

Shadow Room contends that the Board should have imposed the burden of proof on those opposing its renewal application. The club asserts that the Board's failure to shift the burden to the protestants left it with the impossible task of

"proving a negative" – specifically, that its ongoing operations do not adversely affect the peace, order, and quiet of the surrounding area or its residential parking needs, vehicular and pedestrian safety, and real property values.

Shadow Room's argument is foreclosed by the statutory and regulatory provisions that determine the procedures for contested hearings before the Alcoholic Beverage Control Board. Those provisions make clear that the applicant for the issuance or renewal of a liquor license has the burden of proving the appropriateness of its request notwithstanding the opposition of persons or entities protesting its application.

In particular, the alcoholic beverages laws provide that "[t]o qualify for [the] issuance [or] renewal of a license . . . *an applicant shall demonstrate to the satisfaction of the Board* that the establishment is appropriate for the locality, section, or portion of the District where it is to be located." D.C. Code § 25-313 (a) (2012 Repl.) (emphasis added); *see also* D.C. Code §§ 25-313 (b), -315 (b) (2015 Supp.) (listing factors the Board must consider in determining the appropriateness of the license being sought). Municipal regulations provide even greater clarity regarding the allocation of the burden of proof to the applicant:

For purposes of establishing the appropriateness of the establishment under D.C. Official Code § 25-313 (b)(1) through (3), *the applicant shall present to the Board such evidence and argument as would lead a reasonable person to conclude the following*:

(a) The establishment will not interfere with the peace, order, and quiet of the relevant area, considering such elements as noise, rowdiness, loitering, litter, and criminal activity;

(b) The establishment will not have an adverse impact on residential parking needs, considering available public and private parking and any arrangements made to secure such parking for the clientele of the establishment; []

(c) The flow of traffic to be generated by the establishment will be of such pattern and volume as to neither increase the likelihood of vehicular accidents nor put pedestrians at an unreasonable risk of harm from vehicles; [and]

(d) The establishment will not have an adverse impact on real property values in the locality, section, or portion of the District of Columbia where it is to be located.

23 DCMR § 400.1 (2008) (emphasis added). *See generally* D.C. Code § 2-509 (b) (2012 Repl.) ("In contested cases . . . the proponent of a rule or order shall have the burden of proof.").

We therefore conclude that the Board properly assigned the burden of proof to Shadow Room. By law, Shadow Room was required to establish to the Board's

satisfaction that its operations were appropriate in that neither the club nor its patrons would interfere with the peace, order, and quiet of the surrounding area or have an adverse impact on residential parking needs, pedestrian or vehicular traffic, or nearby property values.  There is no legal basis on which the burden of proof properly could have been shifted to the protestants.

## C. Hearsay and Opinion Testimony

Shadow Room argues that the Board erroneously allowed witnesses at the hearing to present hearsay evidence and to testify to their opinions without having been properly qualified as experts.  In particular, Shadow Room complains of the hearsay testimony of Lt. Craig, Mr. Neve, and Mr. Labas concerning incidents of criminal conduct and other disturbances in and around the club and of the opinions articulated by Lt. Craig and Mr. Crumbley about the likely ameliorative effects of a reimbursable police detail.  As to the latter, the club argues that Lt. Craig and Mr. Crumbley lacked the requisite expert qualifications to state opinions about the impact a police detail could be expected to have and that the Board never certified either witness as an expert.  We find no prejudicial error.

The text of the District of Columbia Administrative Procedure Act makes clear that all relevant, non-cumulative evidence may be admitted at a contested administrative hearing: "Any oral and any documentary evidence may be received, but the Mayor and every agency shall exclude irrelevant, immaterial, and unduly repetitious evidence." D.C. Code § 2-509 (b). We have thus stated repeatedly that the law of evidence applicable to court proceedings is relaxed in administrative hearings, *see, e.g.*, *Hutchinson v. District of Columbia Office of Emp. Appeals*, 710 A.2d 227, 233 (D.C. 1998); *In re Thompson*, 583 A.2d 1006, 1007 & n.2 (D.C. 1990), and that hearsay, in particular, is admissible, *see, e.g.*, *Compton v. District of Columbia Bd. of Psychology*, 858 A.2d 470, 476 (D.C. 2004); *Gropp v. District of Columbia Bd. of Dentistry*, 606 A.2d 1010, 1014 (D.C. 1992). As we explained in *Compton*, "[t]he relaxed rules on the admissibility and competence of hearsay evidence in administrative proceedings" reflect the ability of trained agency officials "to assess properly the reliability and probative weight of hearsay evidence – an expertise less likely to be found in the average jury, toward which the traditionally rigorous rules of evidence are aimed." 858 A.2d at 476 n.9. Indeed, in some circumstances, not implicated here, reliable hearsay evidence alone can constitute the substantial evidence on which an administrative agency's findings and conclusions must be based. *Coalition for the Homeless v. District of Columbia Dep't of Emp't Servs.*, 653 A.2d 374, 377-78 (D.C. 1995); *Wisconsin*

*Ave. Nursing Home v. District of Columbia Comm'n on Human Rights*, 527 A.2d 282, 288 (D.C. 1987).

The statutes and municipal regulations governing the admission of evidence at hearings before the Alcoholic Beverage Control Board mirror the broad, inclusive language of the Administrative Procedure Act. *See* D.C. Code § 25-442 (c) (2012 Repl.) ("The Board may exclude any irrelevant or unduly repetitious evidence or testimony."); 23 DCMR § 1714.3 (2008) ("Any oral or documentary evidence may be received, but the Board shall exclude irrelevant, immaterial, or unduly repetitious evidence."). Hearsay, therefore, may be admitted at contested hearings before the Board as long as it is relevant and not cumulative. The Board accordingly had discretion to allow Lt. Craig, Mr. Neve, and Mr. Labas to testify about reports of criminal and other disruptive conduct by Shadow Room patrons outside the club and to give the testimony whatever weight the Board concluded it was fairly entitled to receive.

We have never decided whether a person testifying at an administrative hearing must be formally certified as an expert witness before the person may offer opinion testimony that would require proper expert certification by the court in a judicial proceeding. *Cf. Dyas v. United States*, 376 A.2d 827, 832 (D.C. 1977)

(requiring, as a prerequisite to the admission of expert opinion testimony, that a witness in a court proceeding be determined to have sufficient skill, knowledge, or experience in a field beyond the ken of an average lay person so as to make the witness's opinion likely to aid the trier of fact in the search for the truth). As with hearsay, however, we conclude that trained agency officials can be expected to assess the reasonableness and reliability of a witness's opinions and to give those opinions an appropriate degree of weight and consideration even if the witness lacks the full quantum of education, training, or experience necessary for qualification as an expert in a judicial proceeding. *See Compton*, 858 A.2d at 476 n.9. In accordance with the relaxed rules on the admissibility and competence of evidence, therefore, opinion testimony may be admitted at an administrative hearing with or without a witness's formal and fully supported certification as an expert and may be considered as the agency reasonably deems appropriate in making its findings and conclusions on contested matters.

We find no prejudicial error in the Board's admission of the opinion testimony of Lt. Craig and Mr. Crumbley. The view that a dedicated police presence outside Shadow Room would discourage unruly behavior by the club's customers and facilitate a prompt law enforcement response to criminal conduct was not complex. Nor was there any question that at least Lt. Craig had extensive

experience as a police officer and significant familiarity with the operations of reimbursable Metropolitan Police Department details. The Board thus acted well within its discretion in allowing Lt. Craig to state his opinion about the likely impact of a reimbursable police detail, with or without a formal certification of his expertise. Any possible abuse of the Board's discretion in the admission of Mr. Crumbley's opinion on the same point – testimony of which the Board made no mention in its findings of fact and conclusions of law – was surely harmless. *See Sherman v. Comm'n on Licensure to Practice the Healing Art*, 407 A.2d 595, 602 (D.C. 1979) (A "remand is not required when a mistake of the administrative body is one that clearly had no bearing on the procedure used or the substance of [the] decision reached.") (quotation omitted); *see generally* D.C. Code § 2-510 (b) (2012 Repl.) ("In reviewing administrative orders and decisions, the Court . . . may invoke the rule of prejudicial error.").

### D. Authority to Impose Conditions

Shadow Room contends that the Board lacked legal authority to require it to hire a reimbursable Metropolitan Police Department detail as a condition of the renewal of its liquor license. The club argues that the imposition of a mandatory police detail is inconsistent with statutory and regulatory provisions authorizing

establishments with liquor licenses to enter into voluntary contractual agreements with the Metropolitan Police Department for reimbursable details, *see* D.C. Code § 25-798 (2012 Repl.); 23 DCMR § 718.1 (2016), and with regulations precluding the Alcoholic Beverage Regulation Administration (ABRA) from determining the number of officers needed for any particular detail, *see* 23 DCMR § 718.6 (2016) (previous version at 23 DCMR § 718.5 (2013)).

Shadow Room advanced these same arguments in a post-hearing brief it filed with the Board. The Board rejected the club's arguments in its written findings of fact and conclusions of law, determining, as it had in an earlier case, that the provisions cited by the club impose no limits on the Board's authority under District of Columbia law to require a reimbursable Metropolitan Police Department detail as a condition of the issuance or renewal of a liquor license. *See In re BEG Investments, LLC, t/a Twelve Restaurant & Lounge*, Case No. 12-CMP-00431, Board Order No. 2014-087, ¶¶ 19-21 (D.C.A.B.C.B. Apr. 23, 2014).

We have not previously considered whether the Board may condition the issuance or renewal of a liquor license on the establishment's retention of a reimbursable Metropolitan Police Department detail. We agree with the Board that it may do so under authority granted by D.C. Code § 25-104 (e) (2012 Repl.).

Section 25-104 (e) broadly empowers the Board to set conditions for the issuance of a liquor license:

> The Board, in issuing licenses, may require that certain conditions be met if it determines that the inclusion of the conditions will be in the best interest of the locality, section, or portion of the District where the licensed establishment is to be located. The Board, in setting the conditions, shall state, in writing, the rationale for the determination.

The statute thus imposes two limitations on the Board's authority to set conditions on the issuance or renewal of a liquor license: the Board must find that any conditions to be imposed are in the best interest of the affected area of the city, and it must explain in writing its reasons for imposing the conditions. Beyond those statutory prerequisites, the Board's power to set conditions is circumscribed only by the generally applicable rule that an agency's decision must be supported by substantial evidence in the record and cannot be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See* D.C. Code § 2-510 (a).

The alcoholic beverages laws define a reimbursable Metropolitan Police Department detail as "an assignment of MPD officers to patrol the surrounding area of an establishment for the purpose of maintaining public safety, including the

remediation of traffic congestion and the safety of public patrons, during their approach and departure from the establishment." D.C. Code § 25-798 (a)(3). A police detail is "reimbursable" because the licensed establishment that has requested it is required to compensate the Metropolitan Police Department for the costs of the detail. *See* D.C. Code § 25-798 (a)(1). In some circumstances, the licensee is then eligible for a subsidy from ABRA for up to 70% of certain specified costs of the detail. *See* 23 DCMR §§ 718.1-718.6 (2016).

Nothing in the statutory definition of a reimbursable Metropolitan Police Department detail or in the regulations authorizing a subsidy for some of a detail's costs suggests that a police detail is beyond the broad powers of the Board in setting conditions for the issuance or renewal of a liquor license. Nor do any of the statutory or regulatory provisions cited by Shadow Room favor a contrary interpretation of the Board's authority under § 25-104 (e).

Shadow Room correctly notes that District of Columbia law allows establishments with liquor licenses to enter into voluntary agreements with the Metropolitan Police Department for the provision of reimbursable police details to supplement the licensees' existing security arrangements. *See* D.C. Code § 25-798 (b) ("A licensee or licensees, independently or in a group, may enter into an

agreement with the MPD to provide for reimbursable details."); 23 DCMR § 718.1 ("A licensee, a group of licensees, or a Business Improvement District on behalf of licensees . . . may enter into an agreement with MPD to provide for [a] reimbursable detail and are eligible for reimbursement under the subsidy program."). Yet neither of these provisions supplies even a hint of a legislative intention to limit the availability of reimbursable police details to licensees that have contracted for them of their own volition. Section 25-798 (b) simply authorizes licensed establishments to contract with the police department for details, and 23 DCMR § 718.1 is merely part of a series of regulations that set forth parameters under which establishments that have contracted for police details are eligible for subsidies to cover some of the costs of the details.

Finally, Shadow Room argues that the Board's decision runs afoul of a regulation that prohibits the Board from specifying the number of officers needed to staff any particular detail. We are not persuaded. The regulation cited by the club, 23 DCMR § 718.6 (2016) (previous version at 23 DCMR § 718.5 (2013)), provides only that ABRA "shall not be involved in determining the number of MPD officers needed to work a reimbursable detail." This provision refers only to ABRA's role in providing subsidies to licensees for some of the costs of police details; it has no application to the Board's power to set conditions under § 25-104

(e). In any event, the Board did not state any view on the number of officers required for Shadow Room's police detail; it merely ordered that a detail be hired as a condition of the renewal of Shadow Room's license.

The Board found that a mandatory reimbursable police detail would alleviate the negative impact of the behavior of Shadow Room's patrons on the peace, order, and quiet of the area surrounding the club, and it provided a written explanation of its finding. We understand the Board's finding as a determination, in accordance with § 25-104 (e), that a police detail is in the best interest of the portion of the city in which the club is located. Because, as we discuss below, the Board's finding was supported by substantial evidence in the record and was neither arbitrary, capricious, nor an abuse of discretion, we conclude that the Board had authority under § 25-104 (e) to require a reimbursable Metropolitan Police Department detail as a condition of the renewal of Shadow Room's liquor license.

**E. Substantial Evidence in the Record**

Shadow Room argues that the Board's findings are not supported by substantial evidence in the record. We disagree.

The Board heard ample evidence on which it could find that Shadow Room was having a negative impact on the peace, order, and quiet of the area around the club and on vehicular and pedestrian safety in the neighborhood. Multiple witnesses told the Board of frequent incidents occurring over several years in which Shadow Room's customers were observed yelling, screaming, and fighting on the streets and sidewalks in and around the club at closing time. Additional testimony showed that Shadow Room was in violation of its settlement agreement with the local Advisory Neighborhood Commission and that the club's customers have been seen urinating and defecating in public, engaging in sexual activity on the hood of a vehicle, and racing cars on K and 22nd Streets after leaving the club. Videotapes, police incident reports, and 911 call records corroborated the testimony of the witnesses, whom the Board was well within its powers to find credible notwithstanding the positive investigative report of the ABRA investigator.

We also find substantial evidence in the record to support the Board's conclusion that Shadow Room's retention of a reimbursable police detail is in the best interest of the neighborhood surrounding the club. The evidence showed that Shadow Room's security personnel are not allowed to intervene in altercations beyond a small area in front of the club and that the security staff has not been

successful in containing the loud and unruly behavior of the club's customers at closing time. The evidence showed further that a dedicated police presence outside the club will likely deter aggressive and boisterous conduct by the club's patrons and expedite the arrival of additional police resources if and when incidents occur. We find no abuse of discretion by the Board and nothing arbitrary, capricious, or unsupported about its findings and conclusions.[2]

## F. Discriminatory Motive

Finally, Shadow Room accuses the protestants of opposing its renewal application because of the race, age, attire, and social status of the club's Thursday night customers. This accusation is premised exclusively on testimony provided by Mr. Crumbley, the protestants' private investigator, in response to questions posed by a member of the Board. The Board member asked those questions as a follow-up to Mr. Das's testimony that most of the club's patrons are sophisticated

---

[2] Counsel for Shadow Room asserted at oral argument that the Board acted arbitrarily and capriciously in failing to consider the financial impact of an order requiring the club to retain a reimbursable Metropolitan Police Department detail. Shadow Room did not make this argument in its written briefs before this court, however, and we thus decline to address it. *See Bardoff v. United States*, 628 A.2d 86, 90 n.8 (D.C. 1993) ("Appellants provide no supporting argument in their brief for this general assertion; therefore, we consider [it] to be abandoned."); *see generally Tuckson v. United States*, 77 A.3d 357, 366 (D.C. 2013) (quoting *Rose v. United States*, 629 A.2d 526, 535 (D.C. 1993) ("It is a basic principle of appellate jurisprudence that points not urged on appeal are deemed to be waived.")).

professionals who attend the club in business attire. The testimony alleged to prove an unlawful discriminatory motive was as follows, in its entirety:

MEMBER JONES: The nature of the patron[s] that you saw going into the establishment, were you able to clearly observe patrons entering into the Shadow Room?

MR. CRUMBLEY: Yes, I was.

MEMBER JONES: Okay. In general, how were they – what was their attire?

MR. CRUMBLEY: It was a mixed attire. You had everything from jeans and T-shirts with sneakers to the occasional individual in slacks and a sweater or a button-up shirt.

MEMBER JONES: Okay.

MR. CRUMBLEY: Average age range probably – appeared to be 26 to 28 years of age, mixed race [clientele].

MEMBER JONES: Okay.

MR. CRUMBLEY: I would say maybe 35 to 40 percent African-American and, you know, probably about 15 percent Caucasian and then the rest between Middle Eastern, Hispanic and so forth.

MEMBER JONES: All right. The [clientele] has been described to us as being high-end and sophisticated. Would you share that perspective based on what you observed?

MR. CRUMBLEY: No, not at all.

Shadow Room pressed this same accusation in its post-hearing brief before the Board. The Board rejected the allegation, finding it "unsubstantiated and conclusory." We agree with the Board that Mr. Crumbley's testimony, without more, was insufficient to prove a discriminatory motive on the part of the protestants.

## III. CONCLUSION

For the foregoing reasons, the decision of the Alcoholic Beverage Control Board is

*Affirmed.*